[Civ. No. 63549. Second Dist., Div. Five. Feb. 3, 1983.]

ELTOLAD MUSIC, INC., Plaintiff and Appellant, v.
APRIL MUSIC, INC., et al., Defendants and Respondents.

ETCETERA RECORD ORGANIZATION, INC., Plaintiff and Appellant, v.
COLUMBIA BROADCASTING SYSTEM RECORDS,
Defendant and Respondent.

698

**COUNSEL**

Greenberg & Panish, Horvitz & Greines, Ellis J. Horvitz and Edward J. Horowitz for Plaintiffs and Appellants.

O'Melveny & Myers, William W. Vaughn and Holly E. Kendig for Defendants and Respondents.

**OPINION**

NELSON (J. F.), J.*—These two related actions for intentional interference with contractual relations have been tried four times.

*Assigned by the Chairperson of the Judicial Council.

1. First trial (Eltolad v. April Music): Jury verdict for plaintiff for $20,000 compensatory damages and $1.5 million punitive damages. A new trial was ordered after plaintiff refused to consent to remit most of the judgment. Defendant's motion for judgment n.o.v. was denied.

2. Second trial (Etcetera v. CBS): Defense verdict.

3. First appeal (Eltolad v. April Music): New trial order affirmed; order denying defense motion for judgment notwithstanding the verdict affirmed.

4. Second appeal (Etcetera v. CBS): Judgment in favor of CBS reversed due to instructional errors.

5. Third trial (Eltolad v. April Music): Mistrial declared because of hung jury.

6. Fourth trial (cases consolidated for trial): Jury verdict in favor of Etcetera for $68,213 compensatory damages and $500,000 punitive damages; defense verdict rendered in Eltolad. CBS' motion for judgment notwithstanding the verdict in Etcetera granted; in the alternative, new trial ordered in Etcetera. New trial denied in Eltolad.

Plaintiffs are two corporate alter egos of a single individual producer and promoter of musical talent. Defendants are separately incorporated subsidiaries of a larger corporate entity.

At the trial on this occasion, the jury rendered judgment for plaintiff in one case and for the defendant in the other. The trial court granted a motion for judgment notwithstanding the verdict and, in the alternative, a motion for a new trial as to the prevailing plaintiff. The court also denied a motion for a new trial for the plaintiff who lost.

For the reasons stated in the opinion, we reverse the judgment notwithstanding the verdict, and affirm the orders granting and denying the motions for a new trial.

FACTS

Charlie Greene (hereafter Greene) is a promoter, developer and merchandiser of popular music artists and compositions. In 1969, he formed plaintiff corporation Etcetera Record Organization, Inc. (hereafter Etcetera) for the purpose of producing and marketing popular music records. At the same time, he organized the other plaintiff corporation Eltolad Music, Inc. (hereafter Eltolad) for the purpose of managing composers of popular music.

In August of 1969, Greene came upon a popular music trio then known as "High Mountain Hoedown" (hereafter Group). The Group had recently come to Los Angeles and was performing under the management of Antonio Caruso (hereafter Caruso). The lead guitarist and vocalist for the Group was Jerry Williams (hereafter Williams). Williams was also a songwriter. Soon after the original encounter, Greene engineered an "Exclusive Artists' Recording Agreement" between plaintiff Etcetera and the Group. Williams also signed a separate songwriter's contract with plaintiff Eltolad. Both contracts were consistent with recording industry standards and provided, in effect, for Greene (through the two companies) to have exclusive rights to the musical products of the Group and Williams, subject to the payment of royalties and certain expenses.

With Greene acting as producer, the Group held several recording sessions between the middle of September and the middle of November 1969. Between recording sessions, the Group would return to its home in San Jose where its living expenses were paid by Caruso. While they were in Los Angeles, Greene paid their motel bills and advanced them about $2,500 in cash.

Shortly after signing the contract with the Group, Greene began attempts to sell Etcetera's interest in the Group to professional recording companies. In one of these attempts, he met with executives of defendant Columbia Broadcasting System Records (hereafter CBS) at the latters' offices, and a demonstration tape of one of the recording sessions was played. The CBS representatives were enthusiastic about the Group and expressed an interest in entering into a contract with Etcetera. Some terms were mentioned but no agreement was reached. Later a draft of a proposed contract was delivered by CBS to Greene.

On November 5, 1969, Greene signed a contract on behalf of Etcetera with Atlantic Recording Corporation (hereafter Atlantic) upon terms more favorable to Etcetera than were those in the CBS proposal. Etcetera received $50,000 as a nonrefundable advance against royalties as a part of the Atlantic agreement. However, Greene agreed that if the $50,000 was not recouped from royalties due under the contract, he would allow Atlantic to recover the difference from royalties due him on other contracts with Atlantic.

At a meeting with CBS executives, Ed Matthews (hereafter Matthews) and Rich Schulenberg (hereafter Schulenberg) on November 24, 1969, Greene advised CBS of the contract between Etcetera and Atlantic. CBS reacted to this news with dismay and considerable anger directed at Greene with whom they thought they had a "deal." ASCAP membership representative Peter Burke (hereafter Burke), who was present at the meeting, testified that strong language was used by Matthews toward Greene. Burke stated that Matthews ordered Greene to leave the premises and shouted, "You haven't heard the end of this."

This meeting of November 24th is pivotal to the contentions of the parties. The plaintiffs have contended (and insofar as the Etcetera case is concerned, the jury agreed) that after this meeting CBS wrongfully induced the Group to breach its contract with Etcetera and to sign with CBS. The defendants contend that the Group had been dissatisfied and determined to leave Etcetera before the defendants knew of the Atlantic agreement, and that CBS did nothing to induce the Group to breach its agreement with Etcetera. (The trial judge agreed with this version.)

The evidence is circumstantial and in conflict with respect to the intent of the defendants to induce a breach of contract. It is ironic that the Group with whom the contestants were once so vitally concerned had vanished without a trace and nary a member was called to give testimony.

The plaintiffs point to testimony which indicated that in September CBS suspected that Greene was going to make a deal with Atlantic; and that Schulenberg, one of the CBS executives involved in the negotiations, was upset about this prospect and had a feeling that Greene was ducking his calls. Plaintiffs further refer to testimony that the Group appeared "uninvited" at the CBS offices on the very next day, after the acrimonious meeting of November 24. On November 25, Schulenberg recommended two lawyers to the Group for the purpose of helping the Group dissolve its contract with Etcetera. One of the lawyers was a personal friend of Schulenberg. When the Group failed in an attempt to contact one of the lawyers, Schulenberg personally arranged for a meeting between his lawyer friend and the Group. This lawyer later drew up a letter of rescission which was sent to Etcetera on December 3, 1969. On that same day the Group signed a contract with CBS. The contract had been prepared several days earlier by Schulenberg and was not reviewed by the lawyer.

Testimony showed that on December 9, 1969, the same lawyer sent a letter to the plaintiff Eltolad purporting to rescind Williams' songwriter's contract upon the basis of Williams' minority. Williams, thereafter, signed a songwriter's contract with defendant April Music, a wholly owned subsidiary of CBS.

With respect to damages, plaintiff's evidence showed that Etcetera was indebted to Greene for $50,000 repaid by Greene to Atlantic. Greene further testified that the value of Etcetera's contractual rights with the Group at the time of the breach of contract was $50,000. He based this estimate upon his considerable experience in the promotion of artistic talent. He testified that Etcetera owed him $10,000 for services performed on behalf of the Group, and for an additional $8,213 advanced by Atlantic and repaid by him for the Group's expenses.

The defendants, on the other hand, rely upon testimony which disclosed serious conflicts between Greene and the Group prior to November 24, 1969. Greene himself testified to his dissatisfaction with the manner in which the Group applied itself to work and to continuing disputes over money. He testified that the Group's continued demands for money gave him nightmares and that by November 20th he had decided not to give them any more money. The evidence showed that after the recording session of November 19, 1969, Greene never again saw the Group. In an apparent attempt to demonstrate its alienation, the Group did not show up for a scheduled recording session on November 20, 1969.

On November 25, 1969, the Group appeared at the CBS offices. They asked to see someone and Schulenberg responded. The Group had their Etcetera contract document with them and announced that they were no longer going to perform their contract with Greene. This was the first instance of personal contact between any member of the Group and anyone from CBS. Schulenberg testified that the Group asked him if it was true that Greene had signed them to Atlantic Records. When answered in the affirmative, they expressed anger and concern. Greene had promised them that they would appear on Columbia Records.

The Group then suggested to Schulenberg that they wanted to get out of the contract with Etcetera. Schulenberg testified that he suggested that they see an attorney. When they asked for referral, he suggested two lawyers. One of these was ultimately chosen. No one from CBS participated in the Group's discussion with the lawyer concerning rescission. After learning of the lawyer's letter of rescission sent to Etcetera, Schulenberg assumed that the Group was free to sign with CBS, and this was accomplished.

The jury returned a verdict in favor of Etcetera for $68,213 compensatory damages and $500,000 punitive damages. The same jury returned a verdict for defendant April Music against the plaintiff Eltolad.

The trial court granted defendant CBS' motion for judgment notwithstanding the verdict. The CBS motion for a new trial was also granted as a Code of Civil Procedure section 629 alternative. Eltolad's motion for a new trial was denied.

Plaintiff Etcetera appeals upon the grounds that the judgment notwithstanding the verdict disregarded the law of the case on the liability issue, and that there was substantial evidence to support the jury's verdict. The plaintiff also asserts that the granting of the alternative motion for a new trial was legally improper, because the trial court did not personally prepare the required specification of reasons for factual insufficiency and there were no errors of law.

Plaintiff Eltolad argues only that if a new trial is granted CBS on the grounds of inconsistent verdicts, then a new trial must also be granted Eltolad, and the trial court erred in not so ordering.

We find that there was substantial evidence to support the findings of the jury, both as to liability and damages; and therefore, the judgment notwithstanding the verdict should not have been granted. We also find that the trial court did not err in granting the motion for a new trial in the Etcetera case, or in denying the motion for a new trial in the Eltolad case.

■ Plaintiffs devote substantial attention and energy to the argument that liability in these cases is controlled by the doctrine of law of the case. Even without consideration of the problem of identity of parties to the previous appeals and to this case, the doctrine is not applicable here. In the appeal of which the instant case is the remand, the plaintiff Eltolad appealed from a judgment granting defendant April Music, Inc., a new trial. In that appeal, Eltolad specifically requested the Court of Appeal to limit the issue on retrial to damages. The Court of Appeal, in affirming the granting of the motion, expressly approved a new trial as to all issues. In so doing, the appellate court returned the matter for trial in its pristine state, unencumbered by any limitation by law of the case. Nor does it appear that any appellate court was ever asked to consider the sufficiency of evidence to overcome a motion for directed verdict, or judgment notwithstanding the verdict. In the appeal of Etcetera v. CBS, a defense verdict was overturned because of faulty jury instruction; and in the appeal of Eltolad v. April Music, the granting of a new trial to defendant was upheld as within the discretion of the trial court. Plaintiffs point out that the court in the latter appeal also affirmed the trial court's denial of defendant's motion for judgment notwithstanding the verdict. In holding that there was sufficient evidence to support the verdict against such a motion, while yet granting a motion for a new trial, the appellate court could not have intended that the evidence at the new trial be limited by the record of the old.

Where, "the fact . . . to be decided depends upon the credit to be given to the witnesses whose testimony is received, or the weight to which their testimony is entitled, or the inferences of fact that are to be drawn from the evidence, the sufficiency of the evidence to justify the decision must be determined by the tribunal before which it is presented, and is not controlled by an opinion of an appellate court that similar evidence at a former trial of the cause was insufficient to justify a similar decision." (*Wallace* v. *Sisson* (1896) 114 Cal. 42, 45 [45 P. 1000]; see also, 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 633, p. 4552 et seq.) The doctrine of law of the case does not apply.

■ Notwithstanding the inapplicability of the doctrine of law of the case, we find from the record here that there was substantial evidence to support the

jury's finding both as to liability and as to damages. When the testimony, the documentary evidence and the inferences to be drawn therefrom are viewed in the light most favorable to the decision, they provide support for the jury's belief that the defendants met with members of the Group before the time the Group had severed its relationship with Greene, and that CBS did induce the Group to break its contract with Greene.

Likewise, there is substantial evidence to support plaintiff's claim for damages. In ruling upon the motion for judgment n.o.v., the court cannot second-guess the jury in its determination that the plaintiff corporation was actually out-of-pocket in the exact sum testified to by Greene, or in finding that the corporation owed Greene the exact amount he claimed.

The motion for judgment notwithstanding the verdict should have been denied. (*Hauter* v. *Zogarts* (1975) 14 Cal.3d 104, 534 [120 Cal.Rptr. 681, 534 P.2d 377, 74 A.L.R.3d 1282].)

■ In ruling upon a motion for a new trial, the court is not prohibited from reweighing the evidence or evaluating the credibility of witnesses. On the contrary, the trial court is vested with the authority to disbelieve witnesses and draw inferences from the evidence contrary to those drawn by the jury. (*Mercer* v. *Perez* (1968) 68 Cal.2d 104 [65 Cal.Rptr. 315, 436 P.2d 315].) That appears to be precisely what occurred in this case. Plaintiff does not challenge the court's authority to order a new trial on the basis of insufficiency of evidence to justify the verdict. ■ Rather, plaintiff asserts that the trial judge's order of a new trial was fatally defective because specifications of reasons for the granting of the motion were not prepared by the court in strict compliance with Code of Civil Procedure section 657.

In arguing that the specifications required by Code of Civil Procedure section 657 to be prepared, signed and filed by the trial court were fatally defective, plaintiff places principal reliance upon two Supreme Court cases, *La Manna* v. *Stewart* (1975) 13 Cal.3d 413 [118 Cal.Rptr. 761, 530 P.2d 1073] and *Mercer* v. *Perez, supra,* 68 Cal.2d 104 and several appellate court cases, principally *Oberstein* v. *Bisset* (1976) 55 Cal.App.3d 184 [127 Cal.Rptr. 413], *Worden* v. *Gentry* (1975) 50 Cal.App.3d 600 [123 Cal.Rptr. 496], and *Estate of Sheldon* (1977) 75 Cal.App.3d 364 [142 Cal.Rptr. 119]. Each of these cases emphasizes some aspect of the well-settled rule that where a motion for new trial is granted upon the grounds of insufficiency of evidence, the trial court must personally prepare, sign and file in a timely manner a written specifications of reasons.

The trial judge in the case now before us, after argument and submission, personally drafted a 23-page order granting the defendant's motion for judgment notwithstanding the verdict and, in the alternative, for a new trial in the

Etcetera matter. Approximately 14 pages of this order specify reasons relating to the issue of insufficiency of the evidence both as to liability and as to damages. In the body of the order itself, the trial judge states that some of the language in these 14 pages comes from the memorandum submitted by counsel for the defendant, and some of the language paraphrases other parts of defendant's memorandum. The exact statement of the trial court is as follows:

"IV. A review of the foregoing order, and particularly Part III thereof, will indicate that it quotes portions of the memorandum of CBS in support of the pending motions. In other places, this order paraphrases or summarizes the identical position asserted by CBS. The court is mindful of its obligation to comply with the requirements of C.C.P. 657, and likewise to its obligation to use judicial time efficiently. This court has reviewed the 812 pages of transcript from the first *Eltolad* case which resulted in a hung jury, and the 865 pages of transcript from the Consolidated Trials which are now the subject of these motions. It has reviewed the memoranda filed by plaintiffs and defendant, and the authorities cited therein. Where defendant has accurately and cogently stated a position consistent with the position independently reached by the court, it has become sensible and efficient to adopt or paraphrase the words used by counsel. But in the last analysis, every position and statement herein is of and by this court.

"The court, in this regard, has reviewed *Worden* v. *Gentry* (1975) 50 C.A.3d 600, 606; *Devine* v. *Murrieta* (1975) 49 C.A.3d 855, 860; *Oberstein* v. *Bisset* (1975) 55 C.A.3d 184, 189, and *Estate of Sheldon* (1977) 75 C.A.3d 364, 370.

"This order has been carefully prepared by the court. Where the words used track the words used by CBS, it is because they present a precise and correct statement of the position which the court desires to express. To pursue the general language in cases such as *Oberstein, supra,* to the absurd would require the court to go to devious, circuitous, and possibly incorrect means to state a position just so that it could avoid 'quoting' counsel. Such an extreme position could not have been intended by the Legislature. After all, a rose is a rose. For instance, the testimony of Schulenberg is crucial in this case. An accurate summary of said testimony (relevant here) is that *Williams and the other members of the group came to the CBS offices on their own, saying unequivocally that they had decided to sever all relations with Greene and Etcetera.* Now, the fact that counsel for CBS said those words at pages 8 and 9 of their memorandum should not preclude this court from making the same summary. If the question of whether it was raining on December 31, 1977, at 2:00 p.m. was a pivotal question in connection with granting or denying a motion for a new trial, would anyone question a trial court's right to state that the evidence showed that it was not raining on December 31, 1977, at 2:00 p.m. just because counsel for the moving party had stated in a memorandum that it was not raining on December

31, 1977, at 2:00 p.m.? To state the question is to answer it. Certainly not. After all, counsel and the trial court work with the very same box into which all the evidence is placed. It would be silly to expect the court to use the equivalent of a Roget's Thesaurus in 'converting' any language used by counsel into language of its own. Such semantic, linguistic gymnastics could not have been intended by the Legislature. There has been an economy of time achieved by using some of the defense material, in the same manner an appellate court would use such material in an opinion.''

Suspecting that heresy is at the root of this lengthy apology, counsel for plaintiff indignantly mounts his *La Manna* charger, unfurls the banner of *Auto Equity*,[1] levels the *Oberstein* lance, and sallies forth against this supposed rebellion by the trial judge against the virtue of settled law.

When the scene is viewed with unclouded eye, however, we observe that what counsel has perceived as the campground of section 657 evil is only the windmill of a careful judge and that *La Manna* is, for this battle, only a spavined Rocinante. Here, the learned and experienced trial judge, far from seeking to frustrate the spirit and purpose of Code of Civil Procedure section 657 and *La Manna* v. *Stewart, supra,* 13 Cal.3d 413, goes to extreme lengths to acknowledge and satisfy their demands.

Counsel for plaintiff suggests that because the trial judge admits that certain language in the order is drawn from defense counsel's memo, the order is by this admission rendered a nullity. This argument is not supported by any of the cases cited by plaintiff. The thrust of each of these cases is that the critical factor involved is whose mental processes are being used, not whose language is being employed. ". . . the specification of reasons must be the product of the judge's mental processes and not that of the attorney for the moving party." (*Oberstein* v. *Bisset, supra,* 55 Cal.App.3d 184, 190.) The review of 1,676 pages of transcript, the reading and consideration of memoranda filed by each counsel, review of the authorities cited, and preparation of the lengthy orders and specifications would seem enough, standing alone, to satisfy the requirements of "judicial deliberation before judicial action," "discouragement of hasty or ill-considered orders for new trial," and to "make the right to appeal from the order more meaningful." (*Mercer* v. *Perez, supra,* 68 Cal.2d 104, 113.) Clearly, such deliberation and involvement of the judges's mental process are sufficient when the requisite judicial labors are capped by the verification that *"every position and statement herein is of and by this court."* (Italics added.)

---

[1] *Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450 [20 Cal.Rptr. 321, 369 P.2d 937].

The trial judge was certainly aware of the history of the cases on trial before him and that an appeal of his order was inevitable. His ruling upon the motion for a new trial in the Etcetera case was correct, and his specification of reasons not defective under Code of Civil Procedure section 657.

■ Beyond our approval of the exercise of judicial discretion in granting the motion upon the ground of insufficient evidence, we find one other ground upon which the court properly granted the motion for a new trial. The trial court was incorrect in instructing the jury that plaintiff had the obligation to prove that defendant CBS was "a" moving cause of the contract breach. The defendant's requested instruction that plaintiff had the obligation to prove that defendant was "the" moving cause was improperly refused. (*Dryden* v. *Tri-Valley Growers* (1977) 65 Cal.App.3d 990 [135 Cal.Rptr. 720]; *Augustine* v. *Trucco* (1954) 124 Cal.App.2d 229 [268 P.2d 780] and cases cited.) Given the circumstantial nature of the proof in the case, the trial court could reasonably have concluded that this error materially affected the substantial rights of the defendant.

We find no further basis in the record upon which an order for a new trial might properly have been made. In view of the instruction correctly given the jury that each defendant was entitled to a fair and separate consideration and not to be prejudiced by the jury's determination as to the other defendant, inconsistent verdicts upon the evidence introduced at trial here were both foreseeable and permissible. The granting of a motion for a new trial in this case upon the grounds of inconsistent verdicts is really no more than a restatement by the court that it believed the evidence was insufficient to warrant the plaintiff's verdict in the Etcetera case. Clearly, the court agreed with the defense verdict in the Eltolad matter.

We have already discussed the propriety of granting a new trial upon the grounds that the jury was misinstructed that defendants need be only "a" moving cause of their contract breach rather than "the" moving cause. The court also ordered a new trial on the basis of its failure to give another related instruction on causation, which had been requested by defendant CBS.[2] Insofar as the error would have been cured by the proper causation instruction in the first instance, this additional instruction is unnecessary and it was proper to refuse it. If it had been given and the first causation instruction also given unchanged, the instructions would have conflicted and resulted in certain confusion of the jury. Failure to give the second instruction will not support the granting of a new trial.

---

[2]"Etcetera must prove by a preponderance of the evidence that actions by CBS were the moving cause of inducing the High Mountain Hoedown to break its contract with Etcetera.

"This means that Etcetera must establish by a preponderance of the evidence that the High Mountain Hoedown would otherwise have performed its contract with Etcetera and that the contract was breached because of the wrongful and unjustified acts of CBS and that such wrongful and unjustified acts were the moving cause of that breach."

Despite the trial court's specification of improper instruction of the jury with respect to damages as a reason for a new trial, we find no mistake at all in the damages instructions and find this specification to be unsupported by the record. Likewise, the court was correct in permitting Greene to testify concerning the value of his services to Etcetera (*Mendoyoma, Inc.* v. *County of Mendocino* (1970) 8 Cal.App.3d 873 [87 Cal.Rptr. 740]), and no justification for a new trial is presented by this ruling.

In short, the motion for a new trial in Etcetera was properly granted for insufficiency of the evidence to justify the decision of the jury, and for improper instruction of the jury as to causation of the breach of contract. The remaining stated reasons for granting the motion are insufficient.

The motion for a new trial in *Eltolad* was properly denied.

The judgment notwithstanding the verdict in the case of Etcetera Record Organization, Inc. v. Columbia Broadcasting System Records, Inc., is reversed and the order granting the alternative new trial is affirmed. The judgment in Eltolad Music, Inc. v. April Music, Inc. is affirmed.

Each side to bear its own costs on appeal.

Feinerman, P. J., and Stephens, J., concurred.

A petition for a rehearing was denied March 4, 1983, and respondents' petition for a hearing by the Supreme Court was denied April 13, 1983.