93 Cal.Rptr.2d 60 (2000)
22 Cal.4th 405
993 P.2d 388
Jeffrey LANE, Plaintiff and Appellant,
v.
HUGHES AIRCRAFT COMPANY, Defendant and Respondent.
David Villalpando, Plaintiff and Appellant,
v.
Hughes Aircraft Company, Defendant and Respondent.
No. S059064.
Supreme Court of California.
March 6, 2000.
As Modified on Denial of Rehearing May 10, 2000.
*62 Law Offices of Ian Herzog, Ian Herzog, Santa Monica, Evan D. Marshall and Amy Ardell, Santa Monica, for Plaintiffs and Appellants.
Elaine R. Jones, Washington, Dist. of Columbia, Theodore M. Shaw, Norman J. Chachkin and Darci E. Burrell, for NAACP Legal Defense and Education Fund, Inc., as Amicus Curiae on behalf of Plaintiffs and Appellants.
David S. Schwartz, Mark D. Rosenbaum, Los Angeles, and Rocio L. Cordoba, for ACLU Foundation of Southern California as Amicus Curiae on behalf of Plaintiffs and Appellants.
Joseph Posner, Encino; Quackenbush & Quackenbush and William C. Quackenbush, San Mateo, for California Employment Lawyers Association as Amicus Curiae on behalf of Plaintiffs and Appellants.
Grassini & Wrinkle and Roland Wrinkle, Woodland Hills, for Consumer Attorneys of California as Amicus Curiae on behalf of Plaintiffs and Appellants.
Paul, Hastings, Janofsky & Walker, Paul Grossman, Dennis H. Vaughn, George W. Abele, Paul W. Cane, Jr., and Barbara A. Reeves, Los Angeles, for Defendant and Respondent.
National Chamber Litigation Center, Stephen A. Bokat, Robin S. Conrad, Washington, Dist. of Columbia, Sussan L. Mahallati; Mayer, Brown & Piatt, Andrew L. Frey, Philip A. Lacovara, New York, NY, and Donald M. Falk, Washington, Dist. of Columbia, for Chamber of Commerce of the United States as Amicus Curiae on behalf of Defendant and Respondent.
Fred J. Hiestand, Sacramento, for the Association for California Tort Reform as Amicus Curiae on behalf of Defendant and Respondent.
Irell & Manella, James N. Adler, Gregory R. Smith and Richard H. Zelichov, Los Angeles, for California Employment Law Council as Amicus Curiae on behalf of Defendant and Respondent.
Gibson, Dunn & Crutcher, David A. Cathcart, Timothy S. Lykowski, Los Angeles, and Suzy C. Raster, San Francisco, for the Employers Group as Amicus Curiae on behalf of Defendant and Respondent.
Susan Liebeler; Wiley, Rein & Fielding, Samuel D. Walker, N. Christopher Hardee, Washington, DC; Daniel J. Popeo and Paul D. Kamenar, Washingon, DC, for the Washington Legal Foundation as Amicus Curiae on behalf of Defendant and Respondent.
*61 BROWN, J.
In this case, we consider the standard applicable to review of an order granting a motion for a new trial under Code of Civil Procedure section 657 (section 657). Consistent with our prior decisions, we hold that such an order "must be sustained on appeal unless the opposing party demonstrates that no reasonable finder of fact could have found for the movant on [the trial court's] theory." (Jones v. Citrus Motors Ontario, Inc. (1973) 8 Cal.3d 706, 710, 106 Cal.Rptr. 28, 505 P.2d 220 (Jones).) Because the Court of Appeal did not apply that highly deferential standard in this case, its judgment must be reversed.

I. FACTUAL AND PROCEDURAL BACKGROUND
The parties dispute many factual issues and emphasize different parts of the conflicting evidence in support of their various contentions. We have no reason to summarize the details of these factual contentions. Jeffrey Lane sued Hughes Aircraft Co. (Hughes) for breach of contract, breach of the implied covenant of good faith and fair dealing, fraud, race discrimination and retaliation in violation of the Fair Employment and Housing Act (FEHA). (Gov.Code, § 12900 et seq.) Lane, who is African-American, alleged that Hughes failed to promote him to various management positions because of his race and retaliated against him after he complained to Hughes's human resources department.
David Villalpando sued Hughes for breach of contract, breach of the implied covenant of good faith and fair dealing, intentional infliction of emotional distress and retaliation in violation of the FEHA, claiming Hughes demoted him and constructively discharged him for refusing to write a poor job evaluation of Lane.
*63 At trial, Hughes claimed it had removed Lane from a project known as "KU Band" because of a staffing dispute and that Lane's performance thereafter deteriorated. Hughes's witnesses also testified that they did not pressure Villalpando to give a negative report about Lane and that Villalpando did so on his own initiative. Finally, Hughes's witnesses testified that Hughes did not retaliate against Villalpando.
The jury returned verdicts for both plaintiffs, finding Hughes (1) breached its contracts with Lane and Villalpando by terminating them without good cause and in violation of the implied covenant of good faith and fair dealing, (2) discriminated against Lane because of his race, (3) retaliated against Lane and Villalpando because they reported the discrimination, and (4) constructively discharged Villalpando. The jury also found plaintiffs had "proved by clear and convincing evidence that Hughes ... was guilty of malice, oppression, fraud or despicable conduct," thus qualifying them for punitive damages under Civil Code section 3294, subdivision (a). The jury awarded Lane $295,000 for lost wages prior to trial, $2.3 million for future wage loss, and $3.5 million for emotional distress and other noneconomic damages. The jury awarded Villalpando $125,000 for past wage loss, $1.3 million for future wage loss, and $2 million for emotional distress and other noneconomic damages. At the punitive damages phase of the trial, plaintiffs offered evidence that Hughes's net worth was $1.6 billion. Plaintiffs' attorney then suggested that the proper measure of punitive damages is 50 percent of a defendant's total wealthin this case $800 million. The jury awarded each plaintiff $40 million in punitive damages, for a total award of $89,520,000.
On Hughes's motion, the trial court granted a judgment notwithstanding the verdict. (Code Civ. Proc., § 629.) Among other findings, the court found (1) the record did not contain substantial evidence supporting Lane's discrimination and retaliation claims, (2) Hughes never terminated Lane, (3) Hughes did not instruct or force Villalpando to fabricate a poor job evaluation of Lane, (4) Hughes did not retaliate against Villalpando, and (5) Hughes did not constructively discharge Villalpando. The court also specified it was granting judgment notwithstanding the verdict as to damages for future wage loss because both plaintiffs rejected unconditional offers of reinstatement, and as to punitive damages because there was no clear and convincing evidence of malice.
The court alternatively granted a new trial (§ 657), finding that the record contained insufficient evidence of discrimination and retaliation. It also found insufficient evidence to support the damage award. With respect to punitive damages, the court specifically found that (1) passion and prejudice had motivated the jury, (2) the damages did not bear a reasonable relationship to Hughes's actions or plaintiffs' injuries, and (3) they were grossly disproportionate to the amount of actual damages. In particular, the court noted the case did not involve racist slurs or a pattern of discrimination. The court also granted a new trial because of legal error, including improperly admitting inflammatory evidence and allowing counsel to argue facts not in evidence and to use inflammatory "buzz words." The court concluded "defendant's] witnesses ... were not liars, cheats or conspirators as indicated by the plaintiff, but were sincere businessmen and engineers. They were not racist or biased and went out of their way to assist Lane and Villalpando."
Plaintiffs appealed. The Court of Appeal found sufficient evidence in the record to support the jury's verdict as to liability and compensatory damages, and therefore reversed the judgment notwithstanding the verdict. Nevertheless, the court found the punitive damages excessive, noting that the punitive damages were far greater than the compensatory damages and that the jury did not differentiate between the two plaintiffs. The court concluded that, "[a]s a direct victim of race discrimination, Lane was entitled to a greater award than Villalpando" and reduced Lane's award from $40 million to $5 million and Villalpando's *64 from $40 million to $2,830,000. After the reduction, plaintiffs' total award was $17,350,000.
With respect to the order granting a new trial, the Court of Appeal stated: "[W]e need not consider the trial court's grant of a new trial on the bases of insufficiency of evidence and excessive compensatory damages, as we already analyzed the record with respect to the judgment notwithstanding the verdicts." Thus, the appellate court applied the same standard when reviewing the new trial order as when reviewing the judgment notwithstanding the verdict. The court also rejected the trial court's finding that various legal errors deprived Hughes of a fair trial.
Plaintiffs did not petition for review. Therefore, the Court of Appeal's decision to reduce the punitive damage awards (and the method it employed in calculating the reduction) is not before us, and we express no opinion about it.
Hughes petitioned for review arguing, among other things, that the Court of Appeal improperly applied the same standard when reviewing the new trial order as when reviewing the judgment notwithstanding the verdict. Hughes did not challenge the Court of Appeal's ruling with respect to the judgment notwithstanding the verdict. We granted review and transferred the case back to the Court of Appeal with directions to reconsider in light of Neal v. Farmers Ins. Exchange (1978) 21 Cal.3d 910, 932-933, 148 Cal.Rptr. 389, 582 P.2d 980 (Neal) and Jones, supra, 8 Cal.3d 706, 710-711, 106 Cal.Rptr. 28, 505 P.2d 220, decisions in which we articulated a highly deferential standard under which new trial orders are reviewed. After transfer, the Court of Appeal reached the same conclusions, and we again granted Hughes's petition for review. We now reverse.

II. DISCUSSION
The standards for reviewing an order granting a new trial are well settled. After authorizing trial courts to grant a new trial on the grounds of "[e]xcessive ... damages" or "[insufficiency of the evidence," section 657 provides: "[0]n appeal from an order granting a new trial upon the ground of the insufficiency of the evidence ... or upon the ground of excessive or inadequate damages, ... such order shall be reversed as to such ground only if there is no substantial basis in the record for any of such reasons." (Italics added.) Thus, we have held that an order granting a new trial under section 657 "must be sustained on appeal unless the opposing party demonstrates that no reasonable finder of fact could have found for the movant on [the trial court's] theory." (Jones, supra, 8 Cal.3d at p. 710, 106 Cal. Rptr. 28, 505 P.2d 220.) Moreover, "[a]n abuse of discretion cannot be found in cases in which the evidence is in conflict and a verdict for the moving party could have been reached...." (Id. at p. 711, 106 Cal.Rptr. 28, 505 P.2d 220.) In other words, "the presumption of correctness normally accorded on appeal to the jury's verdict is replaced by a presumption in favor of the [new trial] order." (Neal, supra, 21 Cal.3d at p. 932, 148 Cal.Rptr. 389, 582 P.2d 980.)
The reason for this deference "is that the trial court, in ruling on [a new trial] motion, sits ... as an independent trier of fact." (Neal, supra, 21 Cal.3d at p. 933, 148 Cal.Rptr. 389, 582 P.2d 980.) Therefore, the trial court's factual determinations, reflected in its decision to grant the new trial, are entitled to the same deference that an appellate court would ordinarily accord a jury's factual determinations.
The trial court sits much closer to the evidence than an appellate court. Even the most comprehensive study of a trial court record cannot replace the immediacy of being present at the trial, watching and hearing as the evidence unfolds. The trial court, therefore, is in the best position to assess the reliability of a jury's verdict and, to this end, the Legislature has granted trial courts broad discretion to order new trials. The only relevant limitation on this discretion is that the trial court must state its reasons for granting *65 the new trial, and there must be substantial evidence in the record to support those reasons. (Jones, supra, 8 Cal.3d at p. 710, 106 Cal.Rptr. 28, 505 P.2d 220.)
Here, the trial court granted a new trial on the basis of insufficient evidence and stated reasons in support. Specifically, the court found (1) Lane and Villalpando had not established racism or retaliatory bias, (2) Lane's promotion history was comparable to that of Whites, (3) Villalpando had not significantly supported Lane's discrimination complaints, and (4) there was no indication of retaliation in management's decision to assign someone other than Villalpando to lead his section after merging it with another section. These findings undermined the essential assertions that form the basis of the jury's liability verdict, and therefore provided a sufficient basis for ordering a new trial as to liability.
Plaintiffs argue that the court's specification of reasons is too summary and does not establish the requisite degree of deliberation. (See, e.g., Miller v. Los Angeles County Flood Control Dist. (1973) 8 Cal.3d 689, 697-698, 106 Cal.Rptr. 1, 505 P.2d 193 [the trial court's reasons may not be mere assertions of ultimate fact]; Scala v. Jerry Witt & Sons, Inc. (1970) 3 Cal.3d 359, 369-370, 90 Cal.Rptr. 592, 475 P.2d 864 [same].) Plaintiffs note in this regard that under section 657 the trial court must "weight ] the evidence" and consider "the entire record." But the trial court's specification was adequate.
First, the specification is not a mere statement of ultimate facts, such as that Hughes did not discriminate or retaliate. Rather, the court also found that (1) Lane's promotion history was comparable to that of Whites, (2) Villalpando had not significantly supported Lane's discrimination complaints, and (3) Hughes had a good faith business reason for its management assignments. Moreover, at the beginning of the order, where the court was addressing both the grant of a new trial and the judgment notwithstanding the verdict, it found (1) Hughes did not instruct or force Villalpando to fabricate a poor job evaluation of Lane, (2) Hughes tried to find job opportunities for Villalpando, and (3) Hughes's managers did not refuse to meet with Villalpando after he complained of discrimination.
Second, the context makes clear that, when the trial court stated briefly that it found insufficient evidence of racism and retaliatory bias, it was referring, by way of summary, to the more comprehensive findings it had already made in ruling on the judgment notwithstanding the verdict. Specifically, the court had previously found that (1) Hughes's failure to promote Lane was due to Lane's performance, not his race, (2) Lane's statistical evidence was flawed because it did not indicate the qualifications of employees who were passed over for promotion, (3) Lane was not doing the work of an operations manager and therefore was not entitled to pay at that level, (4) Hughes provided Lane with job opportunities that he did not pursue, and (5) Hughes never terminated Lane. This cross-reference to findings located in a different part of the order was adequate to satisfy section 657. A court need not unnecessarily burden a new trial order by reiterating what it has already said at length with respect to another issue before it (Mercer v. Perez (1968) 68 Cal.2d 104, 115, 65 Cal.Rptr. 315, 436 P.2d 315), so long as it makes clear to a reviewing court the basis for its decision. (Miller v. Los Angeles County Flood Control Dist, supra, 8 Cal.3d at p. 698, fn. 8, 106 Cal.Rptr. 1, 505 P.2d 193 [permitting the trial court to cross-reference another part of its order].) The trial court's order did that here.
Third, the trial court described in detail why the evidence was insufficient to support the damage award, noting that (1) the expert witness who calculated plaintiffs' wage loss made incorrect assumptions about their prospects for promotion at Hughes, (2) Lane remained able to work despite the events at Hughes, (3) Villalpando remained able to work in a managerial position despite the events at Hughes, and (4) plaintiffs did not suffer significant emotional distress. These findings undermined *66 the evidentiary foundation of the compensatory damage award and therefore provided sufficient basis for ordering a new trial as to compensatory damages. Finally, with respect to punitive damages, the court noted that the award was "excessive" and disproportionate to Hughes's conduct and to the extent of plaintiffs' injury and compensatory damages.
The record also supported the foregoing findings. We emphasize again that, so long as the outcome is uncertain at the close of trial  that is, so long as the evidence can support a verdict in favor of either party  a properly constructed new trial order is not subject to reversal on appeal. Here, the evidence could have supported a verdict in Hughes's favor on all causes of action. Plaintiffs did not present irrefutable evidence that Hughes acted without good cause, in bad faith, or unfairly, or that it engaged in fraud, deceit, discrimination, or retaliation. Rather, plaintiffs' allegations depended on circumstantial evidence - company-wide statistics, plaintiffs' promotion and assignment histories and plaintiffs' testimony describing their subjective impressions. Indeed, plaintiffs' counsel conceded that the evidence included no "smoking handgun."
The jury would have been entitled to reject the evidentiary inferences plaintiffs advocated and to disbelieve the testimony of plaintiffs' witnesses in favor of Hughes's evidence. For example, it would have been entitled to find, as the trial court did, that Hughes made its promotion and assignment decisions regarding Lane for good faith business reasons unrelated to his race and discrimination complaints. In this regard, Hughes managers testified that Lane's removal from KU Band was unrelated to his race; that his performance slacked off after he left KU Band; that his promotion history was comparable to Whites at the company; and that Hughes tried to find Lane opportunities in the company.
Furthermore, the jury would have been entitled to accept the testimony of Hughes management that Hughes did not order Villalpando to fabricate negative reports about Lane; that it had a good faith business reason for choosing another employee to lead Villalpando's section after merging it with a different section; and that it tried to find other opportunities for Villalpando in the company. Finally, the jury could have rejected plaintiffs' evidence of damages and accepted instead the testimony of Hughes's witnesses that plaintiffs were capable of working in managerial positions in the aerospace industry despite the events at Hughes, that aerospace jobs were available, and that neither plaintiff suffered serious emotional distress.
Plaintiffs argue the new trial order is invalid because it borrows extensively from briefs filed by defendant. Section 657 provides that the court "shall not direct the attorney for a party to prepare either or both [the new trial] order and ... specification of reasons" supporting it. We give the statute "a reasonable and practical construction" (Mercer v. Perez, supra, 68 Cal.2d at p. 115, 65 Cal.Rptr. 315, 436 P.2d 315), bearing in mind its dual purposes - "to promote judicial deliberation before judicial action," and make appellate review more manageable. (Id. at p. 113, 65 Cal.Rptr. 315, 436 P.2d 315.) Section 657 bars a trial court from imposing upon counsel preparation of new trial orders; it does not prohibit a court from adopting material in a party's brief. Indeed, if a court could not rely on the reasons advanced in the briefs, their utility would be undermined and they would serve little purpose. The "critical factor ... is whose mental processes are being used, not whose language is being employed."[1] (Eltolad Music, Inc. v. April *67 Music, Inc., supra, 139 Cal.App.3d at p. 707, 188 Cal.Rptr. 858.) The trial court satisfies section 657 if its order indicates it deliberated over the issues; we have already concluded the order here complies with that standard.
The Court of Appeal asserted, in support of its decision to reverse the new trial order, that Hughes abandoned its request for a new trial on the issue of liability. Hughes's letter brief in the Court of Appeal does not support this assertion. Rather, Hughes devoted eight pages of its 20-page brief to defending the new trial order as to liability.
The Court of Appeal also found Neal and Jones distinguishable. The court pointed out that in Neal the trial court denied a motion for a judgment notwithstanding the verdict, whereas here the trial court granted such a motion. The court added that in Jones the opinion did not indicate whether or not the case involved a motion for a judgment notwithstanding the verdict. The Court of Appeal was correct as to both points, but it did not explain why these distinctions have any significance here. We can think of none.
The Court of Appeal further determined it did not need to consider whether the evidentiary record supported the new trial order, "since we analyzed whether sufficient evidence supports the verdicts with respect to the judgment notwithstanding the verdicts." Thus, the court continued to apply the same standard of review to the new trial order it applied to the judgment notwithstanding the verdict. As we have said, this method of analysis was wrong. "[T]he presumption of correctness normally accorded on appeal to the jury's verdict is replaced by a presumption in favor of the [new trial] order." (Neal, supra, 21 Cal.3d at p. 932, 148 Cal.Rptr. 389, 582 P.2d 980, italics added.)
Finally, the Court of Appeal noted that, "[w]hile the trial court's order sets forth many factual reasons for granting a new trial, many of these facts do not take into account the conflicting evidence in support of the jury verdicts." We reject the premise of this argument. Conflicting evidence  far from supporting the Court of Appeal's decision to reinstate the jury's verdict  actually places the new trial order beyond review so long as the conflict relates to the trial court's reasons for granting a new trial. "An abuse of discretion [warranting reversal of a new trial order] cannot be found in cases in which the evidence is in conflict...." (Jones, supra, 8 Cal.3d at p. 711, 106 Cal.Rptr. 28, 505 P.2d 220, italics added.)
Hughes challenges the award of damages for future wage loss and also argues the Court of Appeal should have remanded for a new trial rather than modifying the punitive damage award. In light of our conclusion upholding the new trial order, we need not reach these issues. The new trial may result in a defense verdict, which would make them moot. Moreover, Hughes can argue these points during the course of the retrial and any subsequent appeals.
In conclusion, we reaffirm the deferential standards of review articulated in Neal and Jones and hold that the Court of Appeal did not apply these standards properly in this case.

CONCLUSION
The judgment of the Court of Appeal is reversed and the cause is remanded with instructions to affirm the new trial order.
GEORGE, C.J, KENNARD, J, BAXTER, J, WERDEGAR, J, and CHIN, J, concur.
*68 Concurring Opinion by MOSK, J.
I concur in the majority opinion. I write separately to disagree with the views expressed in Justice Brown's concurring opinion (hereinafter concurring opinion). Although no measure adopted by the Legislature so provides, the concurring opinion advocates a brand of judicial lawmaking by declaring that punitive damages must not, absent some special, unspecified showing, exceed actual damages by more than three times. Such a rule cannot be justified.

I.
"The purpose of punitive damages is to punish wrongdoers and thereby deter the commission of wrongful acts." (Neal v. Farmers Ins. Exchange (1978) 21 Cal.3d 910, 928, 148 Cal.Rptr. 389, 582 P.2d 980, fn. 13 (Neal).) In Neal, we set forth three factors relevant to the assessment of punitive damages: (1) the degree of reprehensibility of the act; (2) the amount of compensatory damages awarded; and (3) the wealth of the particular defendant. (Neal, supra, 21 Cal.3d at p. 928, 148 Cal.Rptr. 389, 582 P.2d 980.) The concurring opinion proposes to fix a "soft" ceiling on punitive damages by using only one of the three Neal factors  the amount of compensatory damages. But the primary purpose of compensatory damages is fundamentally different from punitive damages  to make plaintiffs whole, not to deter future harm. There is simply no reason why punitive damages should be limited by some fixed ratio to actual damages.
What the United States Supreme Court stated in the context of a due process analysis of punitive damages is directly relevant here: "[W]e have consistently rejected the notion that the constitutional line [for limiting punitive damages] is marked by a simple mathematical formula, even one that compares actual and potential damages to the punitive award. [Citation.] Indeed, low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages. A higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine." (BMW of North America, Inc. v. Gore (1996) 517 U.S. 559, 582, 116 S.Ct. 1589, 134 L.Ed.2d 809, fn. and italics omitted.) Given that the "simple mathematical formula" has been rejected in the constitutional context because it is illogical, and given that no such formula has been dictated by statute, it is difficult, to say the least, to see why we should impose the rule by judicial fiat, as the concurring opinion proposes.
Our case law reveals a number of instances of intentionally harmful conduct in which only nominal actual damages were awarded because such damages were difficult to quantify, but in which punitive damages hundreds or thousands of times greater were assessed. (See, e.g., Werschkull v. United California Bank (1978) 85 Cal.App.3d 981, 149 Cal.Rptr. 829 [$1 of actual damages and $550,000 in punitive damages for trustee's breach of fiduciary duty]; Contento v. Mitchell (1972) 28 Cal. App.3d 356, 104 Cal.Rptr. 591 [no damages in slander case but $3,000 in punitive damages]; Sterling Drug v. Benatar (1950) 99 Cal.App.2d 393, 221 P.2d 965 [$1 nominal damages and $200 punitive damages for violation of Fair Trade Act]; Clark v. McClurg (1932) 215 Cal. 279, 9 P.2d 505 [same, $0 to $5,000 ratio].) In these cases, the seriousness of the defendant's misconduct was more important than actual damages in gauging the appropriate amount of the punitive damages award. Indeed, this court has emphasized that none of the three Neal factors can be dispensed with in calculating punitive damages awards. (Adams v. Murakami (1991) 54 Cal.3d 105, 111, 284 Cal.Rptr. 318, 813 P.2d 1348.)
To put the matter in other terms, the concurring opinion would flatten out the variability of punitive damage awards by de-emphasizing two important factors used *69 to determine such damages: the extent of the defendant's misconduct and its wealth. As such, the worse the defendant's misconduct, and the greater its wealth, the more it stands to benefit from the concurring opinion's proposed damages limitation.
There appears to be a consensus among researchers that, media perceptions notwithstanding, large and disproportionate punitive damage awards are not a problem in our judicial system in any significant degree  there is no punitive damages crisis. (See Rustad, Unraveling Punitive Damages: Current Data and Further Inquiry (1998) Wis.L.Rev. 15, 54-55.) The concurring opinion concedes as much. (Cone. opn. of Brown, J., post, 93 Cal. Rptr.2d at pp. 73-74, 993 P.2d at pp. 339-400.) Nor are punitive damages a problem in this case, once the proper standard for granting a new trial is enforced. Why does the concurring opinion propose to judicially reform punitive damages? The principal reason given is that such damages are awarded by juries in an arbitrary fashion. But it concedes that the very commentators who criticize punitive damages for their arbitrariness have also criticized reforms like that proposed by the concurring opinion as being at odds with punitive damages' central purpose of deterring wrongful conduct. (See Sunstein et al. Assessing Punitive Damages (with Notes on Cognition and Valuation in Law) (1998) 107 Yale L.J.2071, 2127 ["no theory of punitive damages justifies a [compensatory damages] multiplier approach"].)
Nor is there any indication, as the concurring opinion suggests, that large compensatory damages awards render substantial punitive damages awards unnecessary. On the contrary, commentators have pointed out that punitive damages may partially remedy the systematic undercompensation of plaintiffs in the tort system. (See Saks, Do We Really Know Anything About the Behavior of the Tort Litigation System  and Why Not?, (1992) 140 U.Pa. L.Rev. 1147, 1220-1221.)
While acknowledging that large, undeserved punitive damages awards are not a common occurrence, the concurring opinion finds fault with our current punitive damage system in part because "it distorts settlements by adding disproportionate leverage to a plaintiffs demands...." (Conc. opn. of Brown, J, post, 93 Cal. Rptr.2d at p. 76, 993 P.2d at p. 402.) But it cites no evidence, and there is no indication, that this supposed "disproportionate leverage" on the part of tort or employment discrimination plaintiffs is a problem. On the contrary, there is evidence that plaintiffs are often at a considerable economic disadvantage, particularly individuals suing large corporate entities. (See Cady, Disadvantaging the Disadvantaged: The Discriminatory Effects of Punitive Damages Caps (1997) 25 Hofstra L.Rev. 1005, 1011.)

II.
Aside from this generalized attack on punitive damages, the concurring opinion must answer two questions to justify its position: (1) why choose compensatory damages as the measure of punitive damages? and (2) why three times actual damages? In order to answer both these questions, the concurring opinion cites a number of statutes in which the Legislature has provided for double or treble damages as part of a statutory scheme. It concludes: "The statutory web anchors two observations. First, the Legislature has selected compensatory damages as the best, albeit imperfect, metric for calibrating the punitive component of a damages award. Second, the Legislature has determined that double or treble damages are, in most circumstances, sufficiently punitive." (Cone. opn. of Brown, J, post, 93 Cal.Rptr.2d at p. 75, 993 P.2d at p. 401.)
I disagree with both "observations." The Legislature has in many statutes provided for punitive damages without double or treble limitation, or in fact any limitation. *70 Of course, Civil Code section 3294, the statute generally authorizing punitive damages in noncontract cases, is the most significant example of such a statute. But there are many others as well. (See, e.g., Bus. & Prof.Code, § 14340 [punitive damages authorized for seizure of noncounterfeit goods]; Civ.Code, § 1708.7, subd. (c) [punitive damages for tort of stalking]; id., § 1780, subd. (a)(4) [punitive damages under the Consumer Legal Remedies Act]; id., § 1786.50, subd. (b) [punitive damages for willful violation of Investigative Consumer Reporting Agencies Act]; id., § 1789.21, subd. (a) [punitive damages for violation of Credit Services Act].) Moreover, there are other statutes where punitive damages are authorized, but with a numerical cap. (See, e.g., id., § 1785.31 [punitive damages of not more than $5,000 for violations of Consumer Credit Reporting Agencies Act]; id., § 1788.30 [punitive damages of up to $1,000 for unlawful debt collection].) Yet other statutes specify that no punitive damages are to be awarded. (See, e.g., Bus. & Prof.Code, § 17550.51 [Travel Consumers Restitution Corporation not liable for punitive damages].) Indeed, my research reveals that there are over 150 California statutes that address punitive or exemplary damages. Taking the concurring opinion's figure that double and treble damages are used in "more than 30 instances" (cone. opn. of Brown, J, post, 93 Cal.Rptr.2d at p. 74, 993 P.2d at p. 401), we must conclude that the Legislature has used double or treble damages as a limit on punitive damages in a small minority of the statutes in which it has chosen to address punitive damages.
Thus, the generalization that "the Legislature has selected compensatory damages as the best ... metric for calibrating the punitive component of a damages award" (cone. opn. of Brown, J, post, 93 Cal. Rptr.2d at p. 75, 993 P.2d at p. 401.) is simply inaccurate. Rather, all we can safely generalize, after observing the entire patchwork of punitive damages statutes, is that the Legislature has enacted a number of statutes containing a variety of responses to punitive damages, some providing double damages, some treble damages, some providing monetary caps, some prohibiting punitive damages altogether, and many statutes permitting punitive damages without limitation. The unmistakable inference to be drawn from this patchwork is that the Legislature knew how to limit punitive damages as a multiple of compensatory damages, and in many instances, including the statute broadest in scope, Civil Code section 3294, declined to do so. (See People v. Birkett (1999) 21 Cal.4th 226, 233-234, 87 Cal.Rptr.2d 205, 980 P.2d 912.) Given that inference, by what right may this court second guess the Legislature and import a damages limitation, even a "soft" limitation, when the Legislature has deliberately declined to impose one? By what right may we arbitrarily prefer treble damages to the other statutory methods of dealing with punitive damages? Indeed, the concurring opinion's citation of a number of states that have chosen, by statute, a double or treble damages limitation (see cone. opn. of Brown, J, post, 93 Cal.Rptr.2d at p. 75, 993 P.2d at p. 401, citing BMW of North America, Inc. v. Gore, supra, 517 U.S. at pp. 614-616, 116 S.Ct. 1589 (appen. to dis. opn. of Ginsburg, J.)), only serves to underscore the essentially legislative nature of the reform it is proposing.
There may indeed be some validity to the cautious extension of statutory rules into areas of common law. This was the method advocated by Chief Justice Traynor in his article, Statutes Revolving in Common Law Orbit (1968) 17 Cath.U. L.Rev. 401. A classic example is the use of penal statutes to establish standards of care for purposes of tort liability in instances in which a penal statute does not technically apply. (Id., at pp. 415-417.) A similar method was employed in Moragne v. States Marine Lines (1970) 398 U.S. 375, 390, 90 S.Ct. 1772, 26 L.Ed.2d 339, cited by the concurring opinion, in which the United States Supreme Court overruled *71 an outdated common law admiralty doctrine disallowing wrongful death actions after acknowledging the universal legislative recognition of such actions. But granting the validity of Chief Justice Traynor's method, and indeed even putting aside the problematic fact that we are engaging not in creation of common law but in statutory construction, this method is not correctly applied by the concurring opinion. The success of the method depends on a unified, coherent expression of legislative policy embodied in a statute or statutes from which a common law rule can be derived. But as discussed above, there is no unified, coherent legislative policy regarding punitive damages, and certainly treble damages does not represent such a policy. The concurring opinion's proposal is therefore nothing more than the arbitrary imposition of a soft numerical limitation on punitive damages. Legislatures can impose such numerical limitations.[1] Courts cannot.[2]
The Legislature has, to be sure, delegated to the courts the task of reviewing damages awards and determining when they are "excessive" under Code of Civil Procedure section 657, and this includes punitive damages. Our previous attempts to define the factors to be considered in determining whether an award is excessive were fully consistent with this review function, and with the punitive damages' primary purpose of deterring wrongful conduct. (See Neal, supra, 21 Cal.3d at p. 928, 148 Cal.Rptr. 389, 582 P.2d 980.) The constitutional constraints on punitive damages articulated by the United States Supreme Court provide further guidance for lower courts. (See BMW of North America, Inc. v. Gore, supra, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809.) There is no reason to suppose that judicial review of punitive damages awards following Neal and BMW is not working adequately to restrain excess punitive damages. But even if courts require still further guidance, the arbitrary judicial imposition of a ceiling on punitive damages of no more than three times actual damages is not the answer, for all the reasons explained above.
Concurring Opinion by BROWN, J.
I, of course, agree with the majority opinion as far as it goes. I write separately to address the punitive damages issue in greater detail. In my view, it is not enough merely to reaffirm that the standards for reviewing a new trial order are deferential and then to dispose of this case on that ground. The Legislature has expressly authorized trial courts to grant new trials when damages are "excessive" (Code Civ. Proc, § 657 (section 657)), and the trial court here granted a new trial as to punitive damages on that ground. Our role as the final interpreter of state law obligates us to give meaning to the term "excessive" in relation to punitive damages. Otherwise, the deferential standards of review that we reaffirm today will inhibit us in providing guidance to trial courts as to how their broad discretion should be exercised. (See, e.g., Neal v. Farmers Ins. Exchange (1978) 21 Cal.3d 910, 932, 148 Cal.Rptr. 389, 582 P.2d 980 (Neal) [discussing factors relevant to assessing the size of a punitive damage *72 award though the rule of deference would have provided a sufficient basis to affirm].) In other words, though we defer to trial court rulings, our deference does not free us from the obligation to inform those courts of the considerations we think relevant to their decisions. The point is particularly significant here because, without clear guidance, judicial oversight of punitive damage awards will not be uniform, and the resulting gross variability in awards will ultimately implicate the rights of defendants to due process and the equal protection of the laws under our state Constitution. (Cal. Const, art. I, § 7, subd. (a).)
Here, the trial court found excessive under section 657 a punitive damage award of $80 million. Plaintiffs argue Hughes Aircraft Company's wealth justifies this large award. The wealth of a defendant is clearly relevant when determining the size of a punitive damage award, as is the amount of the compensatory damages and the reprehensibility of the defendant's conduct. (Neal, supra, 21 Cal.3d at p. 928, 148 Cal.Rptr. 389, 582 P.2d 980; see also Adams v. Murakami (1991) 54 Cal.3d 105, 110-111, 284 Cal.Rptr. 318, 813 P.2d 1348.) But merely to state what is "relevant" offers little in the way of concrete guidance. Without a beginning point of reference, punitive damage awards tend to vary widely, depending as much on the vicissitudes of jury decisionmaking as on the facts of the case. This variability can result in disparate and fundamentally unfair treatment of similarly situated defendants, a possibility we should not ignore.
Significantly, the variability in punitive damage awards does not flow so much from any inherent inability of different juries to agree on the wrongfulness of specific conduct. Rather, it results from the way courts ask juries to measure that wrongfulness. If the same evidence were presented to 10 separate juries and each was asked to decide a concrete question of historical fact, we would likely see a reassuring level of uniformity; each jury would be selecting the most plausible fact scenario from a fixed set of options based on specific evidence. Similarly, if 10 juries were asked to rate the egregiousness of a defendant's conduct on a scale of 1 to 6, we again would likely see a reassuring level of uniformity; in that case, the range would be "bounded and anchored ... at both ends" and thus the valuations of all juries would be calibrated to the same scale. (Sunstein et al. Assessing Punitive Damages (with Notes on Cognition and Valuation in Law) (1998) 107 Yale L.J. 2071, 2106 (Assessing Punitives); see generally id. at pp. 2098-2100.) But if we were to ask the same juries to assess the appropriate dollar amount of punitive damages, we would likely see widely varying valuations because, in that case, the upper end of the scale would be "unbounded" while the lower end would remain "defined by a meaningful zero point." (Id. at p. 2106; see generally id. at pp. 2103, 2105.) This phenomenon, which results from the use of a "magnitude scale" without a "modulus," is widely recognized by psychological researchers, who structure their tests in order to account for its effect. (Id. at p. 2106 & fn. 138.)
The variability in punitive damage awards does not, therefore, reflect any inconsistency in jury factfinding, merely that awards are not calibrated to a common scale. (Assessing Punitives, supra, 107 Yale L.J. at pp. 2106-2107.) Nevertheless, jury determinations of punitive damages are likely to contain an element of arbitrariness as long as the awards remain uncalibrated. To assure basic fairness, courts must consider ways of calibrating punitive damage awards. (Id. at p. 2110 ["To obtain the virtues associated with the rule of law, ... the legal system should counteract the arbitrariness that comes from the unbounded scale of dollars."].) We must ask what anchoring variable will make an award of punitive damages an appropriate measure of punishment rather than a test of a jury's ability to imagine big numbers.
*73 There is no question that juries have broad discretion to determine damages. "The measure of damages suffered is a factual question and as such is a subject particularly within the province of the trier of fact." (Bertero v. National General Corp. (1974) 13 Cal.3d 43, 65, fn. 12, 118 Cal.Rptr. 184, 529 P.2d 608.) But discretion must be distinguished from whim and serendipity. In the case of large awards, punitive damages should rarely exceed compensatory damages by more than a factor of three, and then only in the most egregious circumstances clearly evident in the record. In arguing for this standard, I do not mean to suggest that three times compensatory damages is a benchmark measure of punitive damages. (Cf. Assessing Punitives, supra, 107 Yale L.J. at p. 2127 & fn. 191.) Far from it. The standard is an uppermost limit, and most punitive damage awards should fall well below that limit. (See Eisenberg & Wells, Punitive Awards after BMW, a Neiv Capping System, and the Reported Opinion Bias (1998) Wis. L.Rev. 387, 420, 422 (Punitive Awards ) [charting punitive damage awards for all states in 1992 and for California from 1960-1984].)
Commentators have criticized reforms of the kind suggested here, of course. The chief criticism is that, though some sort of calibration of awards is necessary to ensure fairness to defendants, use of compensatory damages as the calibrating factor is arbitrary. (See, e.g., Assessing Punitives, supra, 107 Yale L.J. at p. 2127; Polinsky & Shavell, Punitive Damages: An Economic Analysis (1998) 111 Harv. L.Rev. 869, 900 (Economic Analysis).) In other words, if the purposes of punitive damages are deterrence and retribution, then the amount of compensatory damagesthe amount of harm the defendant caused the plaintiffis irrelevant. For example, if a defendant can easily conceal its conduct or otherwise escape responsibility, a large punitive damage award may be necessary to achieve the appropriate level of deterrence, even if the amount of harm to the plaintiff is relatively small. Similarly, if a defendant does something particularly reprehensible, such as firing a gun into a crowd, a large punitive damage award may be appropriate, even if the bullet providentially lodges harmlessly in a tree. (Ibid.)
However, while deterrence and retribution are part of the equation, fundamental notions of justice require some correlation between punishment and harm. Getting too little good is suffering injustice, and getting too much is doing injustice. (Aristotle, Nicomachean Ethics (Hackett Pub. Co.1985) p. 135.) We expect the punishment to fit the crime. Thus, the use of compensatory damages as a calibrating factor, even if imperfect, is not wholly arbitrary because the degree of harm to the plaintiff bears a substantial relationship to the appropriate punishment. (Neal, supra, 21 Cal.3d at p. 928, 148 Cal.Rptr. 389, 582 P.2d 980.) The use of compensatory damages as a calibrating factor has a long history, dating back at least 700 years. (BMW of North America, Inc. v. Gore (1996) 517 U.S. 559, 581, 116 S.Ct. 1589, 134 L.Ed.2d 809.) Juries naturally select compensatory damages as a calibrating factor when determining punitive damages. In fact, statistical studies establish that "[a]bout half the variance in punitive awards is explained by the level of compensatory awards." (Punitive Awards, supra, Wis. L.Rev. at p. 393, fn. omitted.) This correlation may indicate the extent to which the adage "no harm, no foul" embodies widely shared notions of basic fairness in our society.
Moreover, large compensatory damage awards not based on a defendant's ill-gotten gains have a strong deterrent and punitive effect in themselves. The magnitude of such awards should be considered in deciding whether and to what extent punitive damages should be imposed. We ourselves have pointed the way. "Punitive damages can be justified only as a deterrent measure or as retribution." (Mirkin v. Wasserman (1993) 5 Cal.4th 1082, 1106, *74 23 Cal.Rptr.2d 101, 858 P.2d 568.) But "the additional deterrent value of punitive damages" might not be needed if the "actual damages, alone, represent a potentially crushing liability...." (Ibid.) We should follow the lead of other courts in implementing this observation. (See, e.g., Beliz v. W.H. McLeod & Sons Packing Co. (5th Cir.1985) 765 F.2d 1317, 1332 ["Deterrent effect may be achieved without awarding exemplary damages. Whether an award accomplishes this purpose, in addition to affording compensation, is determined by considering not only the amount allowed to each plaintiff ... but also the total amount of the award...."]; Maiorino v. Schering-Plough Corp. (Ct. App.Div.1997) 302 N.J.Super. 323, 695 A.2d 353, 370 [Punitive damage award not necessary where "the large compensatory damage award ... by itself provided significant deterrence even to an employer as large as [the defendant]."].)
This dual effect of compensatory damages is especially strong when there is a large award for noneconomic harms. This point is well made in the Sunstein law review article: "[Although pain-and-suffering awards are essentially compensatory, there can be little doubt that such awards sometimes reflect jury judgments about the egregiousness of the defendant's behavior. Hence such judgments are likely to have a punitive component." (Assessing Punitives, supra, 107 Yale L.J. at p. 2133.) The trial court should instruct the jury that in determining whether to impose a punitive damage award and, if so, its magnitude, the jury should consider the amount and punitive or deterrent effect of its compensatory damage award. Only if the jury finds the compensatory damage award insufficient to punish or deter should an additional punitive award be imposed. And if imposed, the punitive award must be limited to an amount needed to deter and punish when added to the sum already imposed as compensatory damages. Courts, too, should consider this same factor in deciding whether an award is excessive and, perhaps, in deciding whether to present the question of punitive damages to the jury in the first place.
We already ask juries to consider the reprehensibility of the defendant's conduct. Some commentators argue juries should also consider the defendant's ability to escape responsibility. (Economic Analysis, supra, 111 Harv. L.Rev. at pp. 898-899; but see Assessing Punitives, supra, 107 Yale L.J. at pp. 2111-2112.) Though these considerations might provide important guidance, they are not anchors that can serve to calibrate a jury's award to a common scale in the way compensatory damages can.
There is a related benchmark trial courts should consider in administering section 657. In more than 30 instances, the Legislature has provided for double or treble damages as a punishment for wrongful acts. (See, e.g., Bus. & Prof. Code, §§ 17537.4 [unlawful advertising], 21140.4 [violations of regulations governing fuel franchises]; Civ.Code, §§ 1812.9 [willful violation of laws governing retail installment sales], 1947.10 [evictions based on fraudulent intent to occupy], 3345 [unfair or deceptive practices against senior citizens or disabled persons]; Lab.Code, § 206 [failure to pay certain wages].) Indeed, we are unable to find any context in which it has mandated a greater multiplier than three, notwithstanding the egregiousness of the wrong. Although none of these statutes are directly applicable here, "a legislative policy [may be] a source of law" (Van Beeck v. Sabine Towing Co. (1937) 300 U.S. 342, 351, 57 S.Ct. 452, 81 L.Ed. 685), and statutes "are to be regarded as starting points of reasoning." (Pope v. Atlantic Coast Line R. Co. (1953) 345 U.S. 379, 390, 73 S.Ct. 749, 97 L.Ed. 1094 (dis. opn. of Frankfurter, J.).) Thus, "[c]ourts that fully appreciate their ... obligations with respect to decisional law will not be deterred from a desirable result by inference from legislative silence, but only by some indication of legislative intent to preclude the proposed result." *75 (Williams, Statutes as Sources of Law Beyond Their Terms in Common-Law Cases (1982) 50 Geo. Wash. L.Rev. 554, 567, fns. omitted; Moragne v. States Marine Lines, Inc. (1970) 398 U.S. 375, 392, 90 S.Ct. 1772, 26 L.Ed.2d 339 ["In many cases the scope of a statute may reflect nothing more than the dimensions of the particular problem that came to the attention of the legislature, inviting the conclusion that the legislative policy is equally applicable to other situations in which the mischief is identical."].)
The statutory web anchors two observations. First, the Legislature has selected compensatory damages as the best, albeit imperfect, metric for calibrating the punitive component of a damages award. Second, the Legislature has determined that double or treble damages are, in most circumstances, sufficiently punitive. (See also Civ. Code, § 3426.3, subd. (c) [limiting punitive damages under the Uniform Trade Secrets Act to two times other damages].) Because punitive damages are "in addition to ... actual damages" (Civ. Code, § 3294), an award of treble damages corresponds to a punitive damage award that is two times compensatory damages. Thus, the conclusion that large punitive damage awards should rarely exceed three times compensatory damages gives significantly greater leeway to juries than the Legislature has seen fit to give in these analogous contexts.
The statutes of other jurisdictions are also relevant. (See In re Waltreus (1965) 62 Cal.2d 218, 224, 42 Cal.Rptr. 9, 397 P.2d 1001 [borrowing from federal law in order to develop our common law rules of criminal procedure].) It is significant that our sister states have most frequently selected two or three times compensatory damages as the appropriate limitation on punitive damages. These jurisdictions include Connecticut, Delaware, Florida, Illinois, Indiana, Nevada, North Dakota, Oklahoma and Texas. (See BMW of North America, Inc. v. Gore, supra, 517 U.S. at pp. 615-616, 116 S.Ct. 1589 (appen. to dis. opn. of Ginsburg, J.).) Moreover, several jurisdictions have imposed stricter dollar limits (ibid.), even in the case of intentional and malicious discrimination. (See 42 U.S.C. § 1981a(b)(3) [upper limit of $300,000].) Thus, the limitation I would urge the courts to consider is a relatively modest one, allowing ample flexibility by authorizing courts to approve awards that exceed the limit where appropriate.
At trial, plaintiffs stressed that a defendant's wealth is relevant to determining punitive damages, and argued the extent of that wealth provides an adequate upper limit on a punitive damage award. Wealth is relevant, but it cannot provide an adequate upper limit. Many of the wealthiest defendants are corporations, and the size of a corporate defendant is not an additional evil that in itself warrants an enhanced penalty. (Economic Analysis, supra, 111 Harv. L.Rev. at pp. 910-914.) In order to remain competitive, large corporations count small as well as big costs, particularly if those small costs may be recurrent. Therefore, even for a large corporation, a relatively modest punitive damage award may be sufficient to induce an end to the offensive conduct. Moreover, above a certain level, the precise amount of a defendant's wealth becomes less relevant, compared to other factors, in determining an appropriate punitive damage award. Accordingly, trial courts should not permit attorneys to argue, as plaintiffs' attorney argued here, that punitive damages should be a fixed percentage of the defendant's total net worth.
On the other hand, punitive damage awards should not be a routine cost of doing business that an industry can simply pass on to its customers through price increases, while continuing the conduct the law proscribes. In contract law, we recognize "`efficient breach[ ]'" as being socially beneficial (Freeman & Mills, Inc. v. Belcher Oil Co. (1995) 11 Cal.4th 85, 98, 44 Cal.Rptr.2d 420, 900 P.2d 669), but in the law of punitive damages there is no such thing as "efficient" oppression, fraud or *76 malice. The purpose of punitive damages is to prevent oppression, fraud and malice, not merely to force defendants to internalize the social costs of that conduct. Or, put more accurately, the hidden or unquantifiable social costs of oppression, fraud and malice are so high that the Legislature has determined such conduct has no social benefit. In sum, the law of punitive damages does not punish a large corporation simply for being large; it takes wealth into consideration so as to ensure the award creates an adequate deterrent, even though the award may still be small in relation to the corporation's net worth. (See, e.g., Neal, supra, 21 Cal.3d at p. 928, 148 Cal.Rptr. 389, 582 P.2d 980 and cases cited therein; see also BAJI No. 14.72.2 (8th ed.1994).) In light of these principles, the full extent of a defendant's wealth provides too unbounded an upper limit to be a suitable means to calibrate punitive damage awards. (See 42 U.S.C. § 1981a(b)(3) [taking defendant's size into consideration, but imposing $300,000 limit applicable regardless of size].)
We read often in the popular press of large punitive damage awards. In practice, however, such awards rarely exceed three times compensatory damages. (See, e.g., Punitive Awards, supra, Wis. L.Rev. at pp. 420, 422.) Commentators have cited this lack of a punitive damages crisis as a reason to go slow with respect to reforms. (See, e.g., Rustad, Unraveling Punitive Damages: Current Data and Further Inquiry (1998) Wis. L.Rev. 15, 69.) But arbitrariness in punitive damage awards, even if only occasional, does not affect jury verdicts alone; it distorts settlements by adding disproportionate leverage to a plaintiffs demands, as well as uncertainty. Rather than weighing in favor of no reform, the absence of a punitive damages crisis establishes that a "soft ceiling" is unobjectionable - it will have a direct impact on relatively few cases. The standard advanced here would not affect small awards at all, and in the case of large awards, it would screen out only those that are especially suspect because of the extent they exceed the level of the plaintiffs harm. And even in those few cases, no firm limit is proposed; rather, a suggestion for greater scrutiny of the award, whereby the trial court would favorably consider a new trial motion unless it could articulate specific evidence in the record justifying the high award.
We need not decide the precise measure of punitive damages in this case, but in my view the foregoing discussion is essential to the new trial issue that is before us. When setting punitive damages, a jury does not have the perspective, and the resulting sense of proportionality, that a court has after observing many trials. One of the primary checks against excessive punitive damage awards, essential to ensuring procedural fairness with respect to these awards, is the discretionand, in some cases, the duty  of trial judges to order new trials. (See, e.g., Schelbauer v. Butler Manufacturing Co. (1984) 35 Cal.3d 442, 453, 198 Cal.Rptr. 155, 673 P.2d 743 ["trial courts have traditionally exercised the authority to reduce excessive punitive damage awards"].) As California's highest court, it is our responsibility to give guidance to the trial courts.
Justice Mosk writes separately, not to comment on the majority opinion, but to accuse me of a "generalized attack on punitive damages." (Cone. opn. of Mosk, J., ante, 93 Cal.Rptr.2d at p. 69, 993 P.2d at p. 396.) He misapprehends the point of this exercise. The Legislature has authorized the award of punitive damages - an act clearly within its purview. By enacting section 657, the Legislature has also, as Justice Mosk concedes, conferred on courts the responsibility to define and restrain excessive damages, including punitive damages. (Cone. opn. of Mosk, J., ante, at p. 71, 993 P.2d at p. 398.) Given the infinite range of misconduct and harm which can give rise to claims for punitive damages, it seems both reasonable and necessary to leave the fine-tuning to the courts. It seems equally reasonable for *77 the courts, in developing case law pursuant to the statute, to look to what the Legislature has done in an analogous context. That context, of course, is the civil penalty statutes in which ceilings on recoverable damages have been imposed. These statutes furnish a reliable guide to what the Legislature regards as not excessive. And the fact the Legislature imposed no damages limitation in particular penalty statutes says nothing about the kind of limitations appropriate in the case of punitive damages. Why? Because the Legislature has already imposed a statutory ceiling on such awards by expressly providing for new trials in the case of "excessive damages."
The target of "attack" is thus not punitive damages, but arbitrariness - a due process concern. Nor does the standard outlined here ignore the other Neal factors; it acknowledges that particularly egregious circumstances may justify very large punitive damage awards. By asking trial judges to spell out those circumstances, it gives appellate courts something concrete to review and provides the common law the opportunity to define the kinds of outrageous conduct that should be punished more harshly.
Because this opinion attempts to formulate a common law standard by drawing inferences from analogous legislative activity, Justice Mosk brands it "judicial lawmaking." (Cone. opn. of Mosk, J., ante, at p. 68, 993 P.2d at p. 395.) The language is unfortunate because it betrays a misconception of the responsibility of judges in the common law tradition. When exercising common law powers, all judges "make law," for the techniques of the common law involve reaching beyond positive law for a standard to guide the creation of a new legal rule or to supplement an old one. The real question is not whether judges "make law," it is whether they respect the boundaries imposed on their discretion by precedent and statute, and by constitutional text, design and tradition. It is arrogance, carelessness, and a lack of candor that constitute impermissible judicial practice, not creativity.
As noted, the Legislature has expressly authorized trial courts to grant new trials when damages are "excessive." The standard proposed here would provide trial courts much needed guidance as to the meaning of that word, removing a specter of arbitrariness that hovers over punitive damage awards without, in most cases, substantively affecting the result. Here, defendant based its new trial motion in part on excessive punitive damages. With respect to this issue, I would hold that, in the case of large awards, punitive damages should rarely exceed compensatory damages by more than a factor of three, and then only in the most egregious circumstances clearly evident in the record. By this standard, the punitive damages awarded in this case were excessive, and therefore the new trial order was proper.
CHIN, J., concurs.
NOTES
[1] "`After all, counsel and the trial court work with the very same box into which all the evidence is placed. It would be silly to expect the court to use the equivalent of a Roget's Thesaurus in "converting" any language used by counsel into language of its own. Such semantic, linguistic gymnastics could not have been intended by the Legislature. There has been an economy of time achieved by using some of the defense material, in the same manner an appellate court would use such material in an opinion.'" (Eltolad Music, Inc. v. April Music, Inc. (1983) 139 Cal. App.3d 697, 707, 188 Cal.Rptr. 858.)
[1] In characterizing the numerical limitation of punitive damages as a legislative task, I express no opinion as to whether there are any state constitutional limits on punitive damages reform. (See State ex rel. OATL v. Sheward (1999) 86 Ohio St.3d 451, 715 N.E.2d 1062, 1090-1091.)
[2] The concurring opinion implies that I view the judicial function as a passive one. I do not. Judicial innovation in areas of law not governed by Constitution, statute, or regulation is vital to our common law tradition. Judges working in that tradition must adapt venerable principles and doctrines to meet new needs. (See, e.g., Sindell v. Abbott Laboratories (1980) 26 Cal.3d 588, 163 Cal.Rptr. 132, 607 P.2d 924 [holding that persons unable to identify a particular drug manufacturer that injured them may jointly sue all manufacturers of the drug on an enterprise liability theory].) The imposition of numerical caps on damages, however, is an essentially legislative function.