Filed 12/9/21  Villani v. Palm Springs Unified School Dist. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| JOHN VILLANI, | |
| Plaintiff and Appellant, | E074880 |
| v. | (Super.Ct.No. PSC1606072) |
| PALM SPRINGS UNIFIED SCHOOL DISTRICT, | OPINION |
| Defendant and Respondent. | |

APPEAL from the Superior Court of Riverside County.  L. Jackson Lucky IV, Judge.  Affirmed.

Law Offices of Steven J. Kaplan, Steven J. Kaplan and Erin M. Kelly for Plaintiff and Appellant.

Winet Patrick Gayer Creighton & Hanes and Catherine A. Gayer for Defendant and Respondent.

1

In this wrongful termination lawsuit, a jury returned a verdict for plaintiff and appellant John Villani, but the trial court granted defendant and respondent Palm Springs Unified School District (the district) a new trial on the ground of insufficient evidence. On appeal, Villani contends the court's order does not meet the basic requirements of Code of Civil Procedure section 657 because it fails to (1) explain or reference evidence to sustain the court's conclusion that the "'circumstantial inferences'" supporting Villani's retaliation claim are "'weak,'" (2) identify the witnesses' testimony that contradicted Villani's testimony, and (3) identify the evidence in support of the district's "'bad teacher'" defense. We reject Villani's contentions and affirm.

## I. PROCEDURAL BACKGROUND AND FACTS

### A. *The Complaint and First Jury Trial.*

In November 2016, Villani initiated this action against the district for violation of Labor Code section 1102.5. He alleged that the district retaliated against him and terminated his employment as a probationary intern special education teacher because he complained about his coworker's conduct with a student. Following the first trial on the matter, a jury entered its special verdict on July 2, 2018, finding in favor of the district. According to the special verdict, the jury found: (1) the district was Villani's employer; (2) the district believed that Villani reported a coworker's violation of the law to a government agency; (3) Villani had reasonable cause to believe his coworker violated the law; (4) the district did not reelect Villani; (5) Villani's disclosure of information about his coworker contributed to the district's decision to not reelect him; and (6) the district's conduct was not a substantial factor in causing harm to Villani. Questions No. 7

2

(whether the district proved it would not have reelected Villani for legitimate, independent reasons) and No. 8 (Villani's damages) were left blank.

Villani moved for a new trial based on problems that were discovered when the jury was polled. Although there were no issues regarding the first four questions in the special verdict, polling on questions No. 5 and No. 6 cast doubt on the verdict. Thus, the trial court ruled: "The combination of irregularity in the proceedings ([Code Civ. Proc.] § 657(1)), accident or surprise (C.C.P. § 657(3)), insufficiency of evidence (C.C.P. § 657(4)), and judicial error warrant a new trial." More specifically, the court granted a new trial "as to questions five, six, seven, and eight on the special verdict form."

### B. The Second Jury Trial.

The second jury trial began in September 2019. The special verdict form was shorter because the jury was instructed to accept, as established fact, the first jury's findings as to questions No. 1 through No. 4, inclusive. Thus, the second jury was tasked with deciding the following questions:

"1. Was JOHN VILLANI's disclosure of a violation of law about his co-worker a contributing factor in PALM SPRINGS UNIFIED SCHOOL DISTRICT's decision to non-reelect him? [¶] . . . [¶]

"2. Was PALM SPRINGS UNIFIED SCHOOL DISTRICT's conduct a substantial factor in causing harm to JOHN VILLANI? [¶] . . . [¶]

"3. Did PALM SPRINGS UNIFIED SCHOOL DISTRICT prove by clear and convincing evidence that it would have non-reelected JOHN VILLANI anyway at that time, for legitimate, independent reasons? [¶] . . . [¶]

3

"4.  What are JOHN VILLANI's damages?

"a.  Past economic loss  [¶] . . . [¶]

"b.  Future economic loss  [¶] . . . [¶]

"c.  Past noneconomic loss, including [¶] emotional distress . . . [¶]

"d.  Future noneconomic loss, including [¶] emotional distress . . . ."

*1.  Villani's first academic year (2011-2012) with the District.*

In 1995, Villani began teaching as a substitute teacher in Inglewood.  By 2000, he was a substitute teacher for the district; however, he did not immediately pursue a teaching career.  Instead, his teaching career began in January 2012, when he was assigned to the Center for Learning and Development (CLD) as a probationary intern, teaching special education to elementary school children with behavioral and developmental difficulties.  David Yoder, a paraprofessional, was one of Villani's classroom aides.  Yoder was an adoptive and licensed foster parent.

According to Villani, Yoder took an uncomfortably personal and physical interest in young boys.  Villani became concerned when Yoder and another classroom aide began "talking about two boys who had sex at Father's Heart Ranch" (a residential home for boys, some of whom were students at CLD), and Yoder "continued to ask [the other aide] questions about this act, even when [the students] showed up in the classroom."  Acting on his concern, Villani informed his supervisor, Debra Sather, about Yoder's obsession with young boys.  Villani told Sather about (1) Yoder's comments about middle school boys' "pecs" and how they run like "gazelles"; (2) Yoder's use of a school computer to look at pictures of young boys; (3) Yoder explaining how he wanted to adopt "beautiful

4

boys," which prompted a student witness to tell Villani that Yoder was a "pervert"; and (4) the fact that Yoder was sending inappropriate e-mails to Villani's personal e-mail account.[1]  Sather explained to Villani that she had no way to stop the e-mails because they "were on outside accounts" and, thus, she told Villani that he would "need to inform [Yoder] not to send the e-mails" because "[t]hey weren't welcome."  Villani also conveyed his concerns about Yoder to Kathy Little, who was the director of special education as well as Sather's boss.

2.      *Villani's second academic year (2012-2013) with the District.*

In December 2012, Villani informed Little that it "has been very difficult working with [Yoder]," who would not stop sharing "his personal life and his relations with his foster kids."  Villani admitted that he was "frustrated with [Yoder's] demeanor" and that "[m]anaging him [was] not easy."

Courtney Weber, a former district program specialist and Villani's friend, testified that Villani's strength as a teacher was in "[b]uilding relationships" and his weakness was in the "organization" of paperwork required in the special education department.  On February 8, 2013, Weber sent an e-mail to Villani instructing him to provide a lesson plan to her every Friday for the following week, and she provided him with templates.  She explained that the lesson plans needed to show "explicit details of what's happening" in the classroom; they should "state standards/objectives"; they needed to include what the

---

[1]  The first e-mail was sent on March 7, 2012, at 3:40 p.m.  Yoder sent Villani "a lot of e-mails," which discussed how Yoder liked to entertain boys from Father's Heart Ranch at his home and how they "crave[d]" kisses and hugs.

aides were expected to do; and there should be "a sub plan folder," which included "triggers for each kid, medical info, [and] emergency plans/activities." Weber also noted in the e-mail that Sather was helping Villani with individual education plan (IEP) writing and instruction.

Around February 2013, Villani informed Sather that a seven-year-old student, E.S., stated he had spent the night at Yoder's home. Sather met with the student's mother, Yoder, and others to investigate. Although Yoder and the mother denied the sleepover at Yoder's home, Sather secured their agreement that "if there were interactions between the families that those interactions needed to stay outside of the school environment and not be brought into the classroom." Sather concurred with Villani's concerns about Yoder's contact with the student and the mother because "teachers are the ones that communicate with parents, not instructional aides." On or about April 4, 2013, Little directed Yoder to cease any conversations during school hours regarding his personal relationship with any student's family, to cease electronic communication with any student's parents on any issues related to the classroom, and to redirect any questions posed by a parent back to Villani. On or about May 7, 2013, Villani sent Sather and Little a log of Yoder's conduct between March 11 to May 7, 2013. Sather immediately responded by asking Villani to send future notes/logs to her "daily or not less than weekly." Based on Villani's log, Sather and Little issued a written warning to Yoder on May 30, 2013.

At the end of the year, on May 6, 2013, Little prepared a performance evaluation for Villani which stated: "[Villani] has made great strides in understanding and

addressing the core curriculum. His initial focus was on the behavior of the students in the ED class. Their behavior was such [that] day-to-day instruction was often disrupted. He also did not have a firm grasp of the importance of maintaining weekly lesson plans. He has since begun to follow the plans he has created for all four grade levels he instructs. [¶] Another area of growth is in his ability to manage and assign classroom support staff to address the individual needs of the students. He continues to work with this evaluator regarding the direction of one staff. But it is important to note his growth and the evidence of increased instructional rigor noted in his classroom." Little concluded that Yoder "[p]artially meets standards."

Although Villani was "concern[ed]" about Yoder and had complained about his behavior, Villani never informed Sather that he suspected Yoder of "committing a crime" or that Yoder "was doing anything in his home to molest little boys." Villani first suspected Yoder of "doing something inappropriate with young boys" around March 2013. Villani called child protective services (CPS) and told them "there was a paraprofessional that had an emotionally disturbed student from his class sleeping at his house." Upon telling Sather that he had called CPS about Yoder, she replied, "'Good job.'"

   3. *Villani's third academic year (2013-2014) with the District.*

Following the CLD program closing, Villani was transferred to a district elementary school in August 2013. Villani no longer had any interaction with Yoder, who was transferred to a district high school. At the elementary school, Villani was under the direct supervision of the school's principal, Dr. Simone Kovats. E.S. was also

7

moved to the same elementary school; however, he was only in Villani's class for one day. E.S. walked into the classroom talking on his cell phone. Villani told E.S., "Hey, listen, buddy, we can't have cell phones here. We got to get to work." E.S. replied, "I can use my cell phone if I want. I'm talking to [Yoder]." Villani was "shocked." Villani informed Dr. Kovats about the situation, revealing his prior experience with Yoder, E.S., Sather, and Little while at CLD. Dr. Kovats "just said let him have the cell phone." Villani was not informed that Yoder was in the process of becoming E.S.'s guardian and, during the 2013-2014 academic year, Yoder held E.S.'s educational rights.

On October 18, 2013, Weber e-mailed Villani expressing concern that Villani was not providing daily communication about a student whose IEP required "daily communication." On October 24, 2013, Dr. Kovats went into Villani's classroom to observe him teaching. Her observation was "pretty negative," resulting in Villani being given an "assistance plan." The two reviewed the plan, and Villani "had an excuse for why all the support/pertinent resources that were highlighted would not benefit him. He also informed [Dr. Kovats that] he would need someone to train him on how to do lesson plans since he doesn't 'teach that way.'" Nonetheless, Villani told Dr. Kovats that he intended to try and improve under the plan.

In November 2013, Villani was informed that he needed a letter from the district extending his internship. On November 15, 2013, the district sent a letter to Villani stating: "As you are aware, your Education Specialist Instruction Internship Credential will expire on January 1, 2014, as you have not yet completed the required coursework necessary to obtain your preliminary credential. You have indicated that you can once

8

again extend your internship if the District provides a letter to National University requesting that you remain in your assignment. The District does not intend to provide such a letter." The letter further stated: "Accordingly, effective January 1, 2014, you will be placed on unpaid leave and the Board will take action to non-reelect you from employment pursuant to law." Villani was directed to contact Mauricio Arellano, the assistant superintendent of human resources, to "present any information which may change this determination." Villani contacted Arellano, who authorized an extension of Villani's internship. Subsequently, Robert Nichols, a special education consulting teacher, was assigned to assist Villani with his lesson plans. Nichols summarized their discussion wherein Villani was instructed to begin using a new lesson plan format "asap"; provide a detailed list of curricula needed for his classroom; work on bulletin boards designed to showcase his students' work "asap"; and set-up the classroom computer.

On January 7, 2014, Dr. Kovats scheduled Villani "to observe a behavior management system being implemented in one of [the district's] mild/moderate classes" on January 10. That same month, Dr. Kovats visited Villani's classroom a few times. She spoke with Villani on February 3 and summarized their conversation in a memorandum dated February 11. According to the summary, Dr. Kovats expressed concerns about Villani's absences from the classroom and failure to provide lesson plans for his substitute teacher. Via e-mail, Dr. Kovats informed Villani that beginning the week of February 3, she would utilize a walkthrough tool for feedback. A consultant had reviewed the tool with Villani on January 13.

9

In February 2014, Dr. Kovats recommended that Villani not be reelected based on his classroom instruction. Upon learning of his impending termination, Villani called Arellano and asked why he was being fired when he was improving under the assistance plan. According to Villani, Arellano responded that he did not know, but "maybe you should have left the Yoder thing alone." In contrast, Arellano testified that he did not know about Villani's complaints or any investigation into Yoder's actions until after Villani had left the district. Instead of termination, Villani submitted a letter of resignation at the end of the academic year. Villani was placed at an alternative high school to finish the year, but he was not given any work to do. On April 11, 2014, Weber provided Villani with a generic letter of recommendation.

### 4. *Postdistrict Employment.*

After Villani left the district, he moved to Idaho to teach special education; however, approximately one week prior to the end of the school year, he received a negative evaluation, causing him to resign before being terminated. From Idaho, Villani moved about 80 miles east of Redding, California, where he taught for one year. He then moved to the Sacramento area, where he briefly worked, and finally back to Southern California, where he began working at Foothill High School teaching "English to ninth through 12th grade special education, mild/moderate students."

### 5. *The verdict.*

On October 2, 2019, the jury returned a verdict in favor of Villani, finding that (1) his disclosure of Yoder's violation of the law was "a contributing factor in [the district's] decision to non-reelect him," and (2) the district failed to prove it would not

have reelected him at that time for legitimate, independent reasons. Concluding the district's conduct was "a substantial factor in causing harm" to Villani, the jury awarded him $380,000 in damages: $80,000 for past economic damages; $200,000 for past noneconomic losses; and $100,000 for future noneconomic losses.

### 6. *The motion for new trial.*

On December 6, 2019, the district filed its motion for a new trial on the grounds of insufficient evidence, irregularity in the proceeding, and jury misconduct. First, it argued there was insufficient evidence to support the verdict because there was no evidence that anyone retaliated against Villani. The district asserted that there was evidence showing Sather and Little had supported Villani during the 2012/2013 academic year by reprimanding Yoder. Second, the district argued that there was an irregularity in the proceedings as evidenced by the trial court's failure to exclude e-mails between Yoder and Villani, along with nine jurors indicating "that their decision was based on their perception that not enough was done by the District to prevent" Yoder's conduct. And finally, it argued jury misconduct because two jurors stated they had read that the case had been tried before. During the second trial, Villani's counsel "released two press releases to the media which, if read by any of the jurors, would have made an impact on the jury's decision."

Following oral argument, the trial court affirmed its tentative ruling and granted the motion for a new trial. The minute order provides: "After weighing the evidence, the court is convinced from the entire record, including all reasonable inferences, that the jury clearly should have reached a different decision. (Code Civ. Proc., § 657.) The

11

court finds that there was substantial evidence to support the jury's verdict (see tentative ruling on Motion for Judgment Notwithstanding the Verdict) the evidence does not support the verdict.[2] The court recognizes that evidence of retaliation is necessarily circumstantial. Here, circumstantial inferences are weak. Most of the direct evidence came from Plaintiff's testimony. The court finds Plaintiff's account unpersuasive because almost every other witness contradicted him. The weight of the evidence supported Defendant's position: Plaintiff was an unsatisfactory probationary employee who was resistant to Defendant's (and others) attempts to help him meet standards."[3]

---

[2] This is a direct quote from the record. It appears the trial court meant to say that substantial evidence supports the verdict as to the motion for judgment notwithstanding the verdict, but not as to the motion for a new trial.

The motion for judgment notwithstanding the verdict was denied.

[3] During the hearing, the trial court, in relevant part, stated: "The statement purportedly made by Mr. Arellano, I tend to find plaintiff's testimony about that conversation unpersuasive . . . . He's facing non-reelection. He has a union representative. The person who is going to non-reelect him purportedly says, 'You should have left the Yoder situation alone' and, yet, somehow in the entire course of the union representation, interviews with him sitting in, with him in meeting with management, this bomb never gets brought up. . . . [I]t's something that strained credulity for me, that when someone is facing getting . . . non-reelected over retaliation and has a union representative that somehow that never gets reported to the union representative. It seems to me that would be the centerpiece of the union representation is: You know what that SOB told me during a meeting was you shouldn't have reported this other employee. [¶] But instead, the content of that entire representation is . . . Mr. Villani doesn't write reports . . . or IEPs or different types of paperwork. That Mr. Villani is resistant to any attempts to correct his deficiencies, and those deficiencies are well documented throughout all of the paperwork. That's what [the union representative] Mr. Acker said occurred during these meetings. . . . Ms. Weber, who was Mr. Villani's friend, repeated those same things, not that he's a bad teacher and that he doesn't do well with the kids, but he doesn't do the paperwork. He doesn't do the IEPs. And he refused to work on them. And I forget the gentleman who worked with him at the second school, but we get the same analysis from him. And, surprisingly, even the

*[footnote continued on next page]*

Despite the trial court's comments offered during the hearing, and the

statements in the clerk's minute order concerning the hearing, the final order, filed

plaintiff's expert witness on damages said that where Mr. Villani's personality traits are, he tends to downplay his weaknesses and overstate his strengths, which appeared to be exactly his pattern with his employer and while he testified on the stand. [¶] I don't think that there is any logical inconsistency or legal inconsistency in the defense's position that the district was aware of the complaint. I believe Mr. Villani testified that he reported to Ms. Sather that he had made the report to CPS, and she said good job. So it's clear that Ms. Sather knew. And, again, that tends to . . . show that the retaliation of which he complains, the direct evidence tends to discredit that conclusion. And I don't think that there's anything logically inconsistent with saying, by virtue of the fact that Ms. Sather knew, that the defendant as an entity knew, but that doesn't impute personal knowledge to every single person in the district who might have had decision-making power. To me, the overwhelming way that the evidence shows that Mr. Villani from the very beginning had issues as [a probationary or provisional] employee . . . , but someone who would not have the benefit of tenure or . . . what was essentially the functional equivalent of tenure. [¶] He was told repeatedly in writing where he needed to improve to be reelected. He was given resources with peer counseling by the district. He was given resources by his union to correct these and to a person—every individual that was involved with trying to get him to do the things that were required of a teacher in his position, every single one of them said that he was resistant to making those changes. [¶] When we look at the circumstantial evidence of retaliation, some circumstantial evidence can be very powerful, some circumstantial evidence is much less so. And here, . . . there is . . . very little evidence to support the conclusion that there was retaliation. The dots that one has to connect, the lines are so thin that when we compare the direct evidence of the people who were there, the paper trail showing the well-documented pattern, and then Mr. Villani's position when he testified was that we should disbelieve everybody but him: Mr. Acker; I can't remember if he said that Ms. Weber was lying; . . . one of his more recent employers in the state of Idaho, I believe, was lying; Ms. Sather was lying; Mr. Arellano was lying. If it was just the people on the defendant's side who needed to be lying, I think I would have an easier time saying that this was not a miscarriage of justice, but then when we also have to factor in that the people who were on Mr. Villani's side such as his union representative, such as his employee peer counselors were also either incorrect or lying I think that that is too much for this Court to find persuasive. [¶] And so when I look at the circumstantial evidence supporting retaliation, it is just this side of insubstantial. When I look at the direct evidence supporting retaliation, it is just this side of insubstantial. And when I look at the evidence that the reason for the decision by the district was because of job performance, I think the evidence is overwhelming. [¶] . . . [¶] So with those comments, the tentative ruling will become the ruling of the Court."

13

on January 24, 2020, provides: "[T]he motion of Defendant, PALM SPRINGS UNIFIED SCHOOL DISTRICT, for New Trial is granted on the grounds of insufficiency of the evidence to justify the verdict. The Court finds that the overwhelming weight of the evidence supported Defendant's position that Plaintiff, JOHN VILLANI, was an unsatisfactory probationary employee who was resistant to Defendant's attempts to help him meet the standards of the teaching profession. [¶] . . . After weighing the evidence, the Court is convinced from the entire record, including all reasonable inferences, that the jury clearly should have reached a different decision."

## II. DISCUSSION

Villani argues that the order granting a new trial must be reversed because the trial court did not comply with its mandatory, statutory duty to adequately explain its reasoning. After independently reviewing the order for compliance with the statutory requirements (*Oakland Raiders v. National Football League* (2007) 41 Cal.4th 624, 628), we conclude Villani's argument lacks merit.

"When a trial court grants a new trial, it is required under section 657 of the Code of Civil Procedure to specify both the ground (or grounds) for granting the new trial and 'the court's reason or reasons for granting the new trial upon each ground stated.' [Citation.] '[S]trict compliance' with section 657 is required. [Citation.] The court's *statement of reasons* 's*hould be specific enough to facilitate appellate review and avoid any need for the appellate court to rely on inference or speculation.*'" (*Estes v. Eaton Corp.* (2020) 51 Cal.App.5th 636, 642, italics added.)

"In a line of decisions beginning with *Mercer v. Perez* (1968) 68 Cal.2d 104 . . . , the Supreme Court has explained what this requirement entails when, as here, a new trial is granted on the ground of insufficient evidence. '[T]he trial judge's specification of reasons "must briefly identify *the portion of the record* which convinces the judge 'that the court or jury clearly should have reached a different verdict or decision.'" [Citations.] Although the court is not necessarily required to '"cite page and line of the record, or discuss the testimony of particular witnesses," nor . . . undertake "a discussion of the weight to be given, and the inferences to be drawn from each item of evidence supporting, or impeaching, the judgment"' [citations], it 'must *briefly recite the respects in which* [*the court*] *finds the evidence to be legally inadequate*.' [Citation.] This level of specificity is required 'in order to serve the twofold purpose of the specification requirement: encouraging careful deliberation by the trial court before ruling on a motion for new trial, and making a record sufficiently precise to permit meaningful appellate review.' [Citation.] '[T]he trial court is required to state in its order the theory under which it concludes the jury should have returned a verdict for the moving party, and the order must be sustained on appeal unless the opposing party demonstrates that no reasonable finder of fact could have found for the movant on that theory. . . . [¶] . . . [¶] An abuse of discretion cannot be found in cases in which the evidence is in conflict and a verdict for the moving party could have been reached *under the theory expressed in the order for a new trial*.'" (*Estes v. Eaton Corp.*, *supra*, 51 Cal.App.5th at pp. 642-643, first and third italics in original, second italics added.)

15

"The Supreme Court has reiterated time and again, '[t]*he statement of reasons must refer to evidence*, not ultimate facts.' [Citations.] That is because simply explaining that a party has proved, or failed to prove, ultimate facts as to which it bore the burden is just another way of repeating the *ground* for the order granting a new trial: that the verdict is not supported by sufficient evidence. [Citations.] Yet the trial court must state not just the ground upon which it grants a new trial but also its reasons. [Citation.] Further, such a conclusory explanation does not accomplish the statute's purposes, because it does not reflect that the trial court carefully exercised its broad power to reweigh the evidence nor does it facilitate appellate review of the court's ruling." (*Estes v. Eaton Corp.*, *supra*, 51 Cal.App.5th at p. 643, first italics added, second italics in original.)

In ruling on the district's motion for a new trial, Code of Civil Procedure section 657 allowed the trial court to reweigh the evidence and set aside the jury's verdict if it determined the verdict was against the weight of the evidence. In other words, the court sat "'as an independent trier of fact,'" and its decision whether to grant a new trial rested within its broad discretion. (*Lane v. Hughes Aircraft Co*. (2000) 22 Cal.4th 405, 412.) "The only relevant limitation on this discretion is that the trial court must state its reasons for granting the new trial, and there must be substantial evidence in the record to support those reasons." (*Ibid*.) If, however, the "statement of reasons is insufficient, an appellate court cannot remand the case to permit the trial court to correct the error but must reverse the new trial order with the result that the judgment is automatically reinstated." (*Estes v. Eaton Corp*., *supra*, 51 Cal.App.5th at p. 649.)

16

Here, the court granted a new trial based on insufficient evidence and stated its reasons in support. The court found that Villani was "an unsatisfactory probationary employee who was resistant to" the district's "attempts to help him meet the standards of the teaching profession." These findings undermined the essential assertion that formed the basis of the jury's liability verdict and, therefore, provided a sufficient basis for ordering a new trial as to liability.

We note that the trial court's statement of reasons does not merely state the ultimate facts, such as that the district did not retaliate against Villani and terminate his employment as a probationary intern special education teacher because he complained about his coworker's conduct with a student. Rather, the court focused on Villani's performance as a probationary employee and stated that the overwhelming evidence demonstrated that his performance was unsatisfactory and that he resisted the district's assistance in meeting the standards of the teaching profession. By directing attention to the testimony relating to the district's evaluation of Villani's performance in the classroom, as well as its active support in helping him improve, this statement provides the basis for the trial court's decision. In other words, the "findings undermined the essential assertions that form the basis of the jury's liability verdict," namely, that the district failed to prove its non-reelection of Villani was for legitimate, independent reasons, and "therefore provided a sufficient basis for ordering a new trial as to liability." (*Lane v. Hughes Aircraft Co.*, *supra*, 22 Cal.4th at p. 412.)

This was not a complicated case that involved multiple theories of liability. Rather, the issue was simple and straightforward: Was the district's decision to non-

17

reelect Villani based on legitimate, independent reasons. We have examined the record and note that Villani focused his presentation of evidence on Yoder's infatuation and obsession with young boys, contacts with young male students, and e-mails to Villani during his first two academic years (2011-2012 & 2012-2013) with the district. However, Villani's contact with Yoder ended at the beginning of his third academic year (2013-2014). It was during the third year that the decision to non-reelect Villani was made. The district disputed Villani's claim that its decision was based on his making a report of illegal activity by his coworker and presented extensive evidence regarding Villani's deficient performance as a teacher. While the trial court's explanation for granting a new trial may not be a model statement of reasons, given the sole issue presented in this case, we conclude that it is "specific enough to facilitate appellate review." (*Oakland Raiders v. National Football League*, *supra*, 41 Cal.4th at p. 634.)

### III. DISPOSITION

The order granting a new trial is affirmed. In the interests of justice, the parties shall bear their own costs on appeal. (Cal. Rules of Court, rule 8.278(a)(5).)

NOT TO BE PUBLISHED IN OFFICIAL REPORTS


McKINSTER_____
                                                                          Acting P. J.

We concur:

SLOUGH_____
                     J.

MENETREZ_____
                     J.

18